**William DOVE, Sr., et al., Plaintiffs,**

v.

**Dale BUMPERS, Governor of the State of Arkansas, et al., Defendants.**

**No. PB 68 C-73.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Sept. 17, 1973.

George Howard, Jr., Pine Bluff, Ark., and James N. Finney, New York City, for plaintiffs.

William R. Holland, John A. Davis, III, Pine Bluff, Ark., and Henry Ginger, Asst. Atty. Gen., Little Rock, Ark., for defendants.

Before GIBSON, Circuit Judge, and HENLEY and HARRIS, District Judges.

## MEMORANDUM OPINION

OREN HARRIS, District Judge:

This action was instituted by the plaintiffs, William Dove, Sr., Rev. Isaac Tate, Vannett Johnson, and Albert Baxter, black citizens of Pine Bluff, Arkansas, as a class action challenging the constitutionality of a statute of the State of Arkansas which provides the method of electing aldermen in the cities of the first class with population of 50,000 or more.[1]

It is stipulated by the parties and established that the City of Pine Bluff comes within the category of cities to which the statute, being challenged by the plaintiffs, is applicable.

1. "19–1002.2. Elections in cities 50,000 or more—Officials.—In the general election in the year 1960 and every 4 years thereafter, cities of the first class which now have or may hereafter have a population of 50,000 persons or more according to the Federal Census, and which also have the mayor-council form of government, shall elect the following officials: One [1] mayor, one [1] city clerk, and from each ward of the city, one [1] alderman; all of whom shall hold office for a term of 4 years and until their successors are elected and qualified.

At the general election in the year 1960, such city shall also elect one [1] city attorney, one [1] city treasurer and from each ward of the city, one [1] alderman; all of whom shall hold office for a term of two [2] years and until their successors are elected and qualified.

At the general election in the year 1962 and every 4 years thereafter, such city shall elect one [1] city attorney, one [1] city treasurer, one [1] municipal judge and from each ward of the city, one [1] alderman; all of whom shall hold office for a term of 4 years and until their successors are elected and qualified.

In all primaries or general elections the candidates for the office of alderman shall reside in their respective wards but all qualified electors residing in such cities and entitled to vote in such elections shall have the right to vote at their several voting precincts for each and every candidate so to be nominated or elected."

Jurisdiction of this Court is based on 28 U.S.C.A. § 1343(3) and (4), this being an action to redress the deprivation, under color of the statute of the State of Arkansas, referred to herein, of rights, privileges, and immunities secured by the Fourteenth and Fifteenth Amendments to the Constitution of the United States, and by 42 U.S.C.A. §§ 1981 and 1983. Based upon the allegations of the Complaint, and the entire record, jurisdiction is conferred and established.

It is further established that the proceeding is maintainable as a class action in that the prerequisites, as alleged in the Complaint, are met, i. e., (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. (Rule 23 of the Federal Rules of Civil Procedure)

Further, plaintiffs seek to enjoin the operation of the statute in question through injunctive and declaratory relief pursuant to 28 U.S.C.A. §§ 2201 and 2202, and the convening of a three-judge court as required by 28 U.S.C.A. §§ 2281 and 2284.[2]

The Arkansas State Statute challenged by the plaintiffs as unconstitutional provides that the aldermen shall reside in their respective wards, but that they are to be elected by all qualified electors residing in the City and entitled to vote in such elections. The plaintiffs contend that the majority of the black population of Pine Bluff live in two of the City's four wards. In elections where black candidates are opposed by white candidates, the black candidates are able to secure the majority of votes in the two predominately black wards, but are unable to win the election because there is a majority of white voters in the entire City which overcomes their majority in their particular ward, or wards, when the final vote is counted. In view of this situation, the plaintiffs claim that it is impossible for a black candidate to be elected because the voters of Pine Bluff are polarized along color lines by the vote. It is their contention that, if the aldermen were elected only by those voters residing in the ward which the candidate proposes to represent, the black candidates could be elected in those wards which have a majority of black voters.

The evidence presented in the case consists of stipulations, ore tenus testimony of witnesses, the transcript of the previous hearing by the District Court, and numerous exhibits; from this record, a substantial part of the facts alleged are virtually undisputed.

The City of Pine Bluff, by virtue of its population, is a city of first class, as designed by Arkansas law. Ark.Stat. Anno. § 19–201 et seq. At the time of the trial of this case, Pine Bluff had a

---

2. This litigation was originally filed December 30, 1968. It was assigned to the late District Judge Gordon E. Young. Due to unusual circumstances, resulting primarily from the death of Judge Young, and the plaintiffs' failure to refer to the appropriate state statute in their original pleadings, plaintiffs' request for a District Court of three judges was not granted by the Chief Judge of the Circuit Court of Appeals, Eighth Circuit, until after the case had been regularly scheduled and tried for two days, December 15 and 16, 1971, before District Judge Oren Harris and, the plaintiffs had concluded their testimony and rested their case. At that time the plaintiffs renewed their request for a three-judge court after the confusion was cleared up

as to the state statute being challenged. It was appropriately decided that a new request be made for a three-judge court to be convened. The plaintiffs amended their Complaint on December 2, 1971, to include the appropriate statute under attack, Ark.Stat.1947 Anno. 19–1002.2. Subsequently, on December 15, 1971, a three-judge court was designated to hear and determine the issues involved in the proceedings. By stipulation of the parties, the proceedings before District Judge Harris were transcribed, made available to the designated judges and included in the record as testimony. The additional testimony presented in the case was heard by all three judges on March 26, 27 & 28, 1973.

population of 57,389, of which 34,008 were white, and 23,384 black, or approximately 60% white and 40% black. From the exhibits introduced by both parties, it is shown that the black and white population are essentially grouped into different geographical areas of the City. As already stated, the City is divided into four wards, the second and fourth wards being predominately black and the first and third wards being predominately white. During the trial of the case to the Court, the plaintiffs presented testimony relating the unsuccessful attempts of various black candidates to be elected to the City Council of Pine Bluff. The only black person to serve on the Council in recent years is councilman C. E. Hines, who was first appointed to the Council to fill an unexpired term. At the expiration of the term, he was elected at-large in the regular election for aldermen of the City to a full-term, without opposition, and is presently serving that term.

The plaintiffs insist that, because of the lack of more successful black candidates for the office of alderman, the black citizens of Pine Bluff have suffered and are suffering a deprivation of municipal funds and services enjoyed by white citizens and, that black citizens are excluded from full participation in the political processes of the City of Pine Bluff. These conditions exist, the plaintiffs contend, because the at-large method of conducting elections prevents blacks from being elected to the City Council.

There was extensive testimony and voluminous exhibits presented to the Court by both sides as to the activities of the municipal government of Pine Bluff and, the services rendered to the citizens in recent years and especially since 1964. The full scope of activities of the Pine Bluff Government and services to the people, including streets, sewer, water, parks, police and fire protection, the amount of the City's available funds spent for improvement of city services and facilities, and the location of the expenditures, as they relate to white or black residential areas, are established by the testimony and exhibits of both parties.

From this abundance of testimony, and the exhibits, this Court is not persuaded that there is substantial evidence of discrimination of services rendered by the City Government to its black citizens, as claimed by the plaintiffs, and, furthermore, the Court concludes there is a lack of evidence to support the claim that the black residents of Pine Bluff have any less opportunity than do other Pine Bluff residents to fully participate in the political processes, including the election of aldermen of their choice.

As exhibits to the testimony presented in the case, maps of the entire City of Pine Bluff were introduced which designate the areas of the City, which are predominately black residential by the coloring of those areas yellow. With the aid of these exhibits, and the records of the City which were presented in part by both parties, the Court was able to observe the manner in which the City expenditures have been made, especially as they relate to areas occupied by the different racial groups.

Using the maps to demonstrate in his testimony, Mr. Yale Rabin, a city planner from Philadelphia, Pennsylvania, testifying as an expert witness on behalf of the plaintiffs, stated that he found material difference in the quality of the streets in white areas from those in black areas; that most of the City which had no sanitary sewers were in black areas; that the quality of storm drainage was better in white areas than in black; and that fire hydrants were not properly located in two areas, both of which are black.

However, in considering those facilities which are available to white and black and whether there might be discrimination by the City, it is necessary to determine how, by whom, and in what manner, they were provided. In Pine Bluff, as in most, if not all, cities of the state, a private developer who opens a new subdivision is required to

install and pay for all of the streets, sewer, water and fire protection facilities. Witness Rabin, in his able and expert testimony, made no distinction between improvements installed and, paid for, by private developers and those installed, and paid for, by the City. Based on *his* testimony, therefore, it cannot be said that the Pine Bluff Municipal Government has discriminated in providing these services to its citizens.

Several Pine Bluff citizens testified as to various deficiencies that exist in municipal services needed in the City and complaints were generally expressed because of a lack of facilities of one type or another, especially in the predominately black areas. The testimony is devoid of any facts that the City officials were denying the services to one segment of the community and providing it for another. It is a well known fact that no city can provide everything it would desire for its citizens, nor is there a city wherein its citizens do not wish for more from its officials. Such, however, is not the province or concern of this Court; our duty is to determine if the bounty, however limited, is dispensed without the stigma of discrimination. We conclude that the testimony fails to substantiate the allegations of discrimination as to the services provided by the Pine Bluff Municipal Government to its citizens.

When the record is examined and evaluated with reference to the money spent, and services provided, by the City of Pine Bluff, we find that the areas with predominately black residents have consistently received more, not less, than what would have been their proportionate share of funds available to the City.

Streets are one of numerous examples. Prior to 1964, the City virtually had no street paving program. Witnesses, on the part of the City, testified that before 1964, there would be a limited amount of City funds set aside each year for assistance in paving streets. If a group of property owners desired the street adjacent to their property paved and if they could provide the funds to pay for all of the preparation of the street for paving, the City would go in and put the asphalt on the road bed. This was done on a "first come, first served" basis so long as the funds were available. In 1964, the City began to acquire additional funds to pay for the paving of existing streets and commenced a comprehensive paving program. At that time it was demonstrated that there were miles of unpaved streets in the City. Progress was made in this endeavor to the extent that, at the time of the trial, all of the streets in Pine Bluff had been paved. A vast majority of those streets which were paved from 1964 were in the areas colored yellow on the map, which indicates predominately black residential areas. It should be observed that some of those streets did not have the road beds prepared and were not as substantial as some of the pavement in areas provided by private developers and paid for by private sources.

As to sanitary sewer lines, it was demonstrated that the City is without sufficient funds to build new and extended lines as a general rule. Any new lines are built either by real estate developers or special improvement districts formed by property owners. The exceptions are the large trunk lines which have been financed by bond issues or grants from the Federal Government; a special project involved Jean's Addition, a black subdivision, financed by a federal grant and there were a few isolated extensions to serve residents, most of whom were black. It is clearly established by the evidence that a substantial majority of the funds which were spent by the City, or under the City's supervision, were spent in areas occupied by the minority race in Pine Bluff. Again, the evidence is lacking that the sewer department is operating in a manner which constitutes discrimination against the plaintiffs or other black citizens of the community.

The preponderance of the testimony in the other areas of city services, such as, police, fire, parks, etc., as in the case of

streets and sewer, is to the effect that, if there is disparity in the City's expenditures for such services, it weighs in favor of the areas occupied by black residents.

■ We fail to find any violation of the equal protection clause of the Fourteenth Amendment in the utilization and disbursement of city funds or any violation of the Fifteenth Amendment in the dispensing of city services.

We have no difficulty in distinguishing the facts of this case from those of Hawkins v. Town of Shaw, 437 F.2d 1286 (5 Cir. 1971). In that case nearly 98% of the homes fronting on unpaved streets were occupied by blacks; nearly 97% of the homes not served by sanitary sewer were in black neighborhoods; 100% of the street lighting fixtures had been installed in white neighborhoods; and other statistical evidence illustrated "grave disparities" in providing drainage facilities, water mains, fire hydrants, and traffic control apparatus. In vivid contrast, the record in the instant case makes it quite clear that the majority of funds expended by the City fathers for streets since 1964 has been spent in black neighborhoods; that the preponderant acreage of parks and recreational facilities are situated in predominately black areas; that street lighting and fire fighting equipment are just as accessible to predominately black areas as to the white areas; and that in matters involving administrative services such as zoning, the blacks have been accorded equal protection of the law. If any conclusion can be drawn from the record in this case with regard to provision of municipal services, it is that more funds have been expended in predominately black areas in the last decade than in the predominately white areas.

The Court concludes that, from the testimony, exhibits, and the record in the case, the plaintiffs have failed to establish, by substantial evidence, that there is any discrimination based on race or color with regard to the provision of municipal services by the City of Pine Bluff to its citizens, and the Court further concludes, from a preponderance of the testimony, that neither the plaintiffs, nor those similarly situated, as black citizens of Pine Bluff, are denied equal protection of the law.

The next, and second primary issue which the plaintiffs contend as a deprivation under color of law in their challenge of the constitutionality of the state statute, is that "the City-wide system of electing aldermen operates to deprive a numerically substantial nonwhite minority of Pine Bluff of its proportional share of municipal power and influence." This presents a more difficult question, as has been discussed in representative apportionment cases. Whitcomb v. Chavis, 403 U.S. 124, 91 S. Ct. 1858, 29 L.Ed.2d 363 (1971); White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed. 2d 401 (1965); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex.1972); City of Petersburg, Virginia v. United States, 354 F. Supp. 1021 (D.C.1972); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed. 2d 821 (1963); Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). The line of cases from Whitcomb v. Chavis, supra, to Wells v. Rockefeller, supra, recognizes that "representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies". Reynolds v. Sims, 377 U.S. at 565, 84 S.Ct. at 1383.

The plaintiffs' reply Memorandum states the issue in its clear perspective, which is whether the facts proved in the case establish that the at-large system of election operates so as to make the vote of black residents of Pine Bluff less than equal to the vote of the white residents thereby denying the black voters

"effective participation in the political processes" of the City Government.

To support their contention, the plaintiffs have placed into the record the results of the failure of black candidates for alderman to win elections in Pine Bluff for the last several elections. These results indicate that, in the several elections for aldermen to represent the predominately black second and fourth wards, where there are both black and white candidates, the black candidate would receive a majority of the votes in the ward which they proposed to represent, but would be defeated by the white candidates on a city-wide vote count. Plaintiffs insist that the only acceptable solution to this situation is by the election of aldermen from wards, as opposed to at-large, so that blacks, who are predominate in population in two of the City's four wards, can be assured of proportionate representation on the City Council.

■ It is now a well established principle of law that multi-member districts are not unconstitutional per se. White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed. 2d 320 (1973); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); see also Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964). However, multi-member districts are subject to challenge where the circumstances of a particular case "operate to minimize or cancel out the voting strength of racial or political elements of the voting population". White v. Register, supra; Whitcomb v. Chavis, supra; Fortson v. Dorsey, supra, and Burns v. Richardson, supra.

■ The burden of proof that such condition exists is on the plaintiffs. In the most recent Supreme Court decision on the issues, White v. Regester, supra, the Court stated the rule as to the burden of proof, as follows:

"To sustain such claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiff's burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. at 765, 766, 93 S.Ct. at 2339 (1973).

It has not been established, by the testimony and record, as to the date when the City of Pine Bluff began electing its aldermen in at-large elections. It was obviously a substantial number of years prior to the enactment of the Arkansas Statute being challenged, which was enacted by the Arkansas Legislature in 1959 as Act 176.

The Honorable Emmett Sanders, former Mayor of Pine Bluff, testified that he was first elected to the Pine Bluff City Council in 1936 and, the at-large method was in use at that time and, has been used since. In fact, he stated that it had been used as far back as he could recall. There was some inference that it went back as far as the 20's, or possibly the teens. The record is actually devoid of any proof as to the reason for its establishment in the first place. Suffice it to say that the plaintiffs have failed to establish, by a preponderance of the evidence, that there was any racial motivation which prompted or even influenced the establishment of the method of electing their aldermen.

"To establish a denial of equal protection, a plaintiff must prove the exis-

tence of an intentional or purposeful discrimination by authorities in which one class is favored over another." Bohus v. Board of Election Commissioners, 447 F.2d 821, 822 (7th Cir., 1971).

The plaintiffs' position in this attack on the state statute is that a system of electing aldermen should be devised in such a manner that the black residents of Pine Bluff could be assured the opportunity of electing aldermen in wards which are predominately black and, contend that they have a constitutional guarantee of such arrangement. This argument was clearly rejected by the Supreme Court in Whitcomb v. Chavis, supra, when it said:

"[that view] is expressive of the more general proposition that any group with distinctive interest must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single member-district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Marion County who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas. Indeed, it would be difficult for a great many, if not most, multi-member districts to survive analysis under the District Court's view unless combined with some voting arrangement such as a proportional representation or cumulative voting aimed at providing representation for minority parties or interests." 403 U.S. at 156, 91 S.Ct. at 1875.

The plaintiffs place substantial reliance in support of their contention on City of Petersburg, Virginia v. United States, 354 F.Supp. 1021 (D.C.1972).

Such reliance is misplaced and cannot be accepted as dispositive of the issues in the instant case. In Petersburg, the question was the application of the Voting Rights Act of 1965, § 5 as amended 42 U.S.C.A. § 1973c, on a proposed annexation to the city of parts of two adjacent counties while retaining the at-large method of electing city councilmen. The Court held that the City of Petersburg failed to carry the burden, as required by the Voting Rights Act, of showing that the annexation [which would add a net of approximately 7,000 white persons to the city thereby eliminating the black population majority while retaining an at-large election for city councilmen] does not have the purpose or effect of denying or abridging right to vote on account of race or color.

In other words, under the Voting Rights Act of 1965, the city was required to obtain clearance for an annexation which resulted in a substantial change in the population, or ratio, of white persons to black. The Office of the Attorney General denied clearance under the Act and a three-judge court sustained the decision.

In the instant case, there is no question involving the Voting Rights Act of 1965, with reference to annexations, or any change as the result of annexations in the method of electing councilmen, which, as has been shown, had existed since the 1930's or prior thereto.

The Supreme Court of the United States has made it abundantly clear that the constitutional provisions relied upon by the plaintiffs do not guarantee any race or ethnic group representative in our legislative bodies by a person of their origin or persuasion. In Mann v. Davis, 245 F.Supp. 241 (E.D.Va.1965), a convened three-judge court held, in further response to this contention, as follows:

"The concept of 'one person one vote', we understand, neither connotes nor envisages representation according to color. Certainly it does not demand an alignment of districts to assure

success at the polls of any race. No line may be drawn to prefer by race or color."

"As Justice Douglas, though in dissent but obviously undeniably, tartly put it in Wright v. Rockefeller, 376 U.S. 52, 62, 66, 84 S.Ct. 603, 609, 11 L.Ed.2d 512 (1964): 'The fact that Negro political leaders find advantage in this nearly solid Negro and Puerto Rican district is irrelevant to our problem. Rotten boroughs were long a curse of democratic processes. Racial boroughs are also at war with democratic standards.' "

"Page 66, page 611 of 84 S.Ct.: ' * * * The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. * * * Of course race, like religion, plays an important role in the choices which individual voters make from among various candidates. But government has no business designing electoral districts along racial or religious lines. * * * ' " At page 245

The vagaries and capriciousness of the political process, in whatever context, needs no documentation that they exist in any political arena. In elections referred to by the plaintiffs to establish unconstitutional discrimination of their political rights based on inability of blacks to be elected, it has been shown that all of the black candidates who testified in the case relating to their defeat were either independent or Republican candidates. No independent or Republican has been elected to the City Council in Pine Bluff, regardless of racial background, within the memory of any of the witnesses. The black candidates were opposed by incumbents. No one could recall an incumbent ever being unseated. Any number of other factors, some of which may not even be detected, could have influenced the outcome of the elections. It is not possible to ascribe, on the record before us, the black candidates' lack of success to either the fact that they were black or to the at-large system which produces a city-wide vote.

Furthermore, the record in this case clearly indicates that the black citizens of Pine Bluff do, in fact, have an active and viable participation in the processes of local government. The evidence establishes an untrammeled voter registration participation with the impetus coming both from the black and white citizens; blacks frequently run for elective office and, there is no indication that they were prohibited or discouraged from participation within the political parties. Blacks freely and frequently participate in City Council meetings where grievances are aired. Several of the witnesses testified that they had attended council meetings and, expressed their complaints about various matters and numerous incidents were cited where action was taken by the City Government as a result of blacks voicing their dissatisfaction. Blacks are regularly and consistently appointed to the boards and commissions of the City and, as has been already pointed out, on the City Council, as an elected member. The black voters of Pine Bluff unquestionably influence the outcome of elections and, their vote is generally considered an important factor in elections. The present Mayor testified that when he was first elected Mayor in 1964 he received a substantial majority of the black vote and, that he attributed his success to that vote. Significantly, he also testified that he has received a majority of the black vote at every election wherein he was a candidate for re-election since then and that the percentage of the black vote he received has increased at every election.

We conclude that, on this issue, the plaintiffs have failed in their burden of proof of establishing, by a preponderance of the testimony, that the method of electing the members of the City Council of Pine Bluff in at-large elections operates in a manner that denies the black voters effective participation

in the political processes of the City Government.

In summary, we conclude, from the testimony of the witnesses, exhibits, and the entire record, that the state statute under attack is not unconstitutional, per se and that the plaintiffs have failed to discharge their burden of proof that the operation of the statute prevents participation by the black citizens of Pine Bluff in the nomination and election of aldermen on an equal basis with the other residents of the City. Further, we conclude that the municipal services are dispensed in Pine Bluff, by the City Government, without regard to racial considerations and, therefore, the at-large election of aldermen, who are required to live in the ward, does not result in a disparity of municipal services.

Having reached these findings and conclusions, the Court is of the opinion that the plaintiffs' Complaint should be dismissed.

We incorporate our findings of fact and conclusions of law in this opinion pursuant to Rule 52 of the Federal Rules of Civil Procedure.

An order will be entered in accordance with this opinion.