**Hattie KENDRICK et al.,
Plaintiffs-Appellants,**

v.

**James WALDER, Individually and as Mayor of the City of Cairo, Illinois et al., Defendants-Appellees.**

**No. 75–1291.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1975.

Decided Dec. 16, 1975.

**46**

James C. Munson, Keith C. McDole, Philip C. Stahl, John E. Angle, Chicago, Ill., Michael P. Seng, Cairo, Ill., Gerald J. Muller, Chicago, Ill., for plaintiffs-appellants.

John G. Holland, Cairo, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and SWYGERT and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

The question in this appeal concerns pervasive racial discrimination in Cairo, Illinois, allegedly resulting from the use of at-large elections under a commission form of municipal government. Plaintiffs-appellants, black residents of the City of Cairo, filed a class action seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983.[1] Defendants are officials responsible for conducting city council elections in Cairo. Plaintiffs challenge the actions of these officials taken under the authorization of Illinois Revised Statutes, Chapter 24, §§ 4–3–2, 4–3–5,[2] alleging that these provisions as they operate in Cairo have the effect of depriving them and members of their class of certain rights in violation of the equal protection clause of the Fourteenth Amendment and the provisions of the Fifteenth Amendment which prohibit the denial or abridgment of voting rights on account of race, color, or previous condition of servitude.

Defendants moved to dismiss the complaint in November of 1973.[3]

1. 28 U.S.C. § 2201 reads:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2202 reads:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

42 U.S.C. § 1983 reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Jurisdiction is alleged under 28 U.S.C. § 1343.

2. These sections require that communities adopting the commission form of government discontinue their division into wards and institute an at-large system of elections and in the event that a primary election is necessary (when there are more than two candidates per council seat) that it also be conducted on an at-large basis. Illinois Revised Statutes, chapter 24, § 4–1–1 et seq. allow a community to adopt a commission form of government which is vested with all legislative, administrative and executive powers.

3. Defendants set forth seven grounds in support of their motion, including the ground that it was necessary to convene a three-judge court in order to declare a state statute unconstitutional. The district court judge concluded that since plaintiffs' claim was purely local in nature and did not challenge the statewide application of the statute, the case did not require a three-judge court. The need for such a court is a jurisdictional requirement and if it was error for a single judge to act in this case, the appropriate action for this court to take would be to remand the case for trial by a three-judge court. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 153, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). A three-judge court is not

Nearly fourteen months later the lower court entered its judgment, dismissing plaintiffs' complaint and stating that "beyond a doubt . . . there is no set of facts that could be proven in support of plaintiffs' claim that would entitle them to relief."[4] The question for resolution on this appeal is whether plaintiffs have stated a claim upon which relief could be granted under the Constitution of the United States and the Civil Rights Act. We believe they have.

In essence, the plaintiffs contend that, as implemented in Cairo, the provisions of the Illinois statutes permitting communities to adopt a city commission form of government and conduct at-large elections instead of retaining an aldermanic system in which elections are conducted from single-member wards,

minimizes, dilutes, and cancels out their voting strength as a group. Plaintiffs further allege that as a result of this dilution, the election of blacks to the Cairo City Council is precluded; the nomination and election of white residents unresponsive to plaintiffs' need and interests are guaranteed; blacks are excluded from appointive positions in the local government; and racial discrimination in the community is enhanced.

Plaintiffs have alleged sufficient facts to constitute a cause of action under the equal protection clause of the Fourteenth Amendment to the United States Constitution.[5] While on its face the use of at-large elections appears to be a neutral system for the election of representatives, its maintenance and use may in fact represent a subtle form of discrimination which operates to disadvantage

necessary, however, if an injunction is sought against local officials, *Wilentz v. Sovereign Camp, W.O.W.,* 306 U.S. 573, 59 S.Ct. 709, 83 L.Ed. 994 (1939), unless those officials are performing a state function and enforcing a policy of statewide concern which applies generally to all such bodies within the state. *Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967); *Moody v. Flowers,* 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967). While the State of Illinois offers certain communities the option of selecting a commission form of government, it is not the validity of the statute which authorizes the choice that is in issue in this case. Plaintiffs' complaint focuses only on the choice made by Cairo in view of the alleged racial discrimination and polarization particular to that city. If the plaintiffs succeed after trial, there would be no impact beyond the City of Cairo. As the Supreme Court noted in *Ex Parte Bransford:*

[i]t is necessary to distinguish between a petition for injunction on the ground of the unconstitutionality of a statute as applied, which requires a three-judge court, and a petition which seeks an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional. The latter petition does not require a three-judge court. In such a case the attack is aimed at an allegedly erroneous administrative action. 310 U.S. 354, 361, 60 S.Ct. 947, 951, 84 L.Ed. 1249 (1939).

From the complaint involved in this case, it is clear that plaintiffs' allegations fall into the latter category. Their attack is centered on the result obtained in Cairo through the use of

the Illinois statute and they seek to enjoin only local Cairo officials from conducting further at-large elections in that city. An administrative order which misinterprets or distorts a valid state law can result in a denial of equal protection where there is design or intent to discriminate or a suspect classification results. *Snowden v. Hughes,* 321 U.S. 1, 7–8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). Political rights in local elections are within the protection of the clause. *Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959).

4. *Kendrick v. Walder,* No. CV 73–19–C (E.D. Ill., Jan. 29, 1975) *mem.* pp. 6–7.

5. A showing that there was a denial or an abridgement of the right to vote on account of race would also violate the Fifteenth Amendment. While there are indications in Fifteenth Amendment cases that both the purpose *and effect* of the practice will be considered when distinctions are drawn between black and white voters, *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), plaintiffs in this case have alleged their votes are diluted as a result of the at-large system of election. This allegation fits neatly into a Fourteenth Amendment equal protection analysis. We need not, therefore, consider if it is necessary to show "purpose" in a Fifteenth Amendment complaint—the "effect" of a system which discriminates against minorities is subject to scrutiny under the Fourteenth as well as the Fifteenth Amendment. *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971).

certain Cairo voters. In terms of the question of population equality and apportionment, the at-large system is the fairest, with each voter's vote weighed equally with that of all other persons in the election area. There are no ward lines drawn so as to create an imbalance—the population deviation is zero.

█ A facially neutral system may operate, however, to dilute, minimize, or cancel out minority voting strength. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) *(en banc), rev'g,* 467 F.2d 1381 (5th Cir. 1972). The courts have examined multi-member districts for their discriminatory potential under the theory that such a system might dilute the votes of a minority group.[6] The analysis in this line of equal protection cases does not stop with a consideration of whether the one-man, one-vote ideal has been achieved, but reaches beyond mathematical equality to see if the group in question can obtain effective representation within the electoral system as it operates. This is not to suggest that the designation of seats for minority representatives in proportion to their voting strength is compelled (or even permitted) by the equal protection clause, but if, as a result of the method of apportionment, the group is disadvantaged in its use of the ballot, an equal protection claim may exist. *White v. Regester, supra; Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965).

█ Where, as here, no official distinctions have been drawn between voters, plaintiffs may still demonstrate that they have been disadvantaged by the system. The inquiry is not conducted in a vacuum, nor in the abstract. The total situation as it exists in the particular locality is considered and an actual impact on voters' rights must be demonstrated:

> [t]he plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. *White v. Regester, supra* at 766, 93 S.Ct. at 2339 citing *Whitcomb v. Chavis, supra* at 149–50, 91 S.Ct. 1858.

Plaintiffs in this case have sought the opportunity to make such a demonstration.

Without considering the merits of plaintiffs' claim, it may be beneficial to relate the factual allegations contained in their complaint to the charge that their votes and political effectiveness as a group have been diluted or cancelled out through the use of the at-large system of voting in Cairo. Whether the allegations truly reflect conditions as they exist in that city is a question which must be reserved until after trial in the district court. *Lipscomb v. Jonsson,* 459 F.2d 335 (1972).

In addition to pointing out that since the institution of the at-large system no black has been elected to the city council, a fact which may in itself indicate that minorities have been denied an equal influence in the political process, plaintiffs have set forth allegations in their complaint which indicate that Cairo has been and continues to be a racially polarized community. Plaintiffs state that the continuance of the at-large system furthers polarization and discrimina-

---

6. For the purposes of deciding the questions in this case, at-large electoral schemes are analytically the same as multimember districts. The multimember district differs from the use of an at-large system in a city only by the extent of the geographical area covered by the election. In both instances, several representatives are chosen from one area, mandating that voters select more than one candidate, instead of the voters of several divisions selecting one representative whose constituency is defined by ward or district boundaries.

tion since the dilution of their voting power permits, and perhaps encourages, resort by white candidates to campaign tactics which make race a factor in the elections in Cairo in order to appeal to the white majority. Among the examples which plaintiffs offer to demonstrate that there is a legacy of discrimination in Cairo operating today to disadvantage blacks are: the maintenance until 1952 of a dual school system; the segregation in the schools which continued even after the two systems were consolidated and culminated in the establishment of an all-white, tax-exempt, private school in the 1960's; the division of the city's park into "black" and "white" sections which was maintained until 1952; and the continuing discrimination evidence by the labor unions and the employers in Cairo. These, and other non-political factors bolster and give depth to plaintiffs' assertion that the electoral process discriminates against members of their class—the residue of discrimination also encompasses the quality of political life for blacks in Cairo.

■ The use of an at-large system of voting, not in itself unfair to any individual voter, when imposed on a community with a history and legacy of discrimination against an identifiable group may operate to deny that group an opportunity for effective participation in the electoral system. The portions of plaintiffs' complaint which relate specifically to the operation of the political machinery in Cairo (some of which if isolated might appear neutral or equivocal), take on a new dimension viewed against such a pattern of discrimination. It would, for example, not be inconceivable that plaintiffs could show, as they assert here, that blacks are discouraged from running for office, that any effective political coalitions are impossible between whites and blacks, that whites will not vote for black candidates, and that the election is virtually given to the candidates listed on all-white slates compiled by informal all-white groups. These allegations and others made by plaintiffs, in view of the level of residual discrimi-

nation, would support the conclusion that blacks are excluded from the political process. Plaintiffs also contend that the council is not responsive to their interests or needs and is, in fact, hostile to them and members of their class. This fact, if proved, also lends weight to the claim that plaintiffs are denied effective representation by the operation of an at-large voting system in Cairo.

The inquiry the district court must undertake in cases of this nature should focus on the type of facts plaintiffs here have alleged. The central element in their claim is that in this particular set of circumstances they are denied equal protection due to the operation of the electoral system. As the Supreme Court recognized a decade ago in connection with multimember districts:

> [d]esignedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case [might] operate to minimize or cancel out the voting strength of racial or political elements of the voting population. *Fortson v. Dorsey, supra* at 439, 85 S.Ct. at 501.

Illuminated by findings of fact that support the allegations here, the fact that few blacks have ever been appointed to positions in local government and that none have been elected to the city council in the sixty-two years since the use of ward districting was abandoned take on additional significance.

We emphasize that plaintiffs' complaint is not that their candidates were not chosen in a fair and neutral political contest; rather they claim that the system contains a built-in bias against them. If proved, their allegations would indicate that in Cairo the election process does more than simply provide a method by which a candidate is selected from among other contenders. *Cf. Whitcomb v. Chavis, supra* at 153, 91 S.Ct. 1858. Plaintiffs do not complain merely because their candidate has lost in the political arena, but they allege that the process by which the elections are run invidiously discriminates against them.

It is to remedy this wrong that we must apply the equal protection clause to see if plaintiffs are denied effective representation.

We realize that the contours of the dilution doctrine are not yet well defined. (*Cf. Zimmer v. McKeithen, supra,* which lists a "panoply" of factors the Fifth Circuit thought were relevant.) The Supreme Court did not until 1973 and the case of *White v. Regester, supra,* find an electoral system violated equal protection standards under the theory that the votes of a group were diluted, minimized, or cancelled out, though it had recognized such a possibility much earlier. *Fortson v. Dorsey, supra; Whitcomb v. Chavis, supra; Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). We realize that there are distinctions between the instant case and *White v. Regester.* That case involved the multimember districting for state legislative representatives in an apportionment system which also included single member districts, and the number of voters was larger than that involved in this case.[7] It is also true, as noted by the district court, that a state representative body was involved in *Regester* while the at-large system in the instant case is confined to a local governing body.[8] We fail to see that this presents any significant basis for distinction.

In state legislative bodies the problems confronted often extend beyond the individual districts and require compromise and concession. The representatives have a responsibility to bring the unique views of their districts to the attention of the legislature and the legitimacy of the legislative process may be increased when the uniform use of single member districts ensures equal representation for voters of one district vis-a-vis the voters of another. It may be more rational therefore to use an at-large system when the responsibility of the representatives so chosen extends only to the area covered by such a system as it does in the city council situation. Although this may generally be true, the need for citywide solutions to the problems in Cairo is counter-balanced by the plaintiffs' allegations that their interests are not synonymous with those of the white majority in Cairo and are frustrated by the use of at-large elections which guarantee the election of those who are unresponsive to their needs.

Moreover, the fact that numbers of voters involved in this case are less than those in *Regester* does not minimize the plaintiffs' complaint. Although the size does have implications, *e. g.,* the expense involved in campaigning increases with the size of the constituency as does the need for resort to forms of mass communication to reach voters; and the potential for dilution appears to increase as the size of the constituency increases, plaintiffs should have the opportunity to show that they have suffered a disadvantage even though the size of the electorate is small. The city council is the primary organ of local government and its decisions affect plaintiffs' daily lives. If they are prohibited from achieving effective representation in that body, they should be afforded relief.

■ The district court's opinion also evidenced concern because the at-large system was not imposed by the governing body but was the result of a referendum vote by the people of Cairo. The fact that it was the voters and not the council which chose the form of election cannot defeat the plaintiffs' equal protection claim.

---

7. The census figures for 1970 indicate that the population of the City of Cairo is 6,227. In *Regester,* by contrast, the population of the multimember districts was 1,300,000 and 800,000. *Graves v. Barnes,* 343 F.Supp. 704, 720 (W.D.Tex.1972), *aff'd in part and rev'd in part sub nom., White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

8. The court also suggested that a distinction could be made between this case and *Regester* because in that case multimember districts were involved and in this case the entire city was the area. As noted *supra* n. 6 for the purposes of our discussion, multimember districts are analytically the same as a city-wide at-large system.

A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be . . . the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance . . .. *Lucas v. Colorado General Assembly,* 377 U.S. 713, 736–7, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964). (citations omitted.)

The citizens of Cairo cannot, therefore, by adopting the commission form of government dilute the plaintiffs' votes. Nor, does the fact that plaintiffs could appeal to those same voters by initiating a referendum to abolish the commission form of government and the at-large elections attached to it, offer a refuge against suit for the defendants. Plaintiffs' resort to remedy the wrong is not to the electorate but to the courts.

Plaintiffs have asked the court to dismantle the at-large system and to oversee the institution of a ward system in Cairo similar to those used in other cities in Illinois. If after trial the plaintiffs establish the truth of their allegations and demonstrate that their votes are diluted, minimized, or cancelled out by the electoral system in Cairo, the district court should explore the relief appropriate under the circumstances of the case.

The decision of the district court is reversed and the case is remanded for trial.

PELL, Circuit Judge (dissenting).

As the author of *Littleton v. Berbling,* 468 F.2d 389 (7th Cir. 1972), rev'd on other grounds, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), I am not unmindful of, nor unsympathetic with, the situation in which black citizens of Cairo, Illinois, find themselves. Nevertheless, because I think this court has incorrectly disposed of the present appeal, I respectfully dissent.

The State of Illinois has legislatively made available to most of its municipalities several forms for local administration purposes. One of these forms, the city commission plan, was adopted by Cairo, Illinois, in 1913 and has been continuously utilized since that time. In Cairo, a community of some 6000 persons, the mayor and four commissioners are nominated and elected at-large pursuant to the statutory provisions. Illinois Revised Statutes, Chapter 24, Section 4–3–2. Some 64 other communities in the state qualifying as being under the statutory maximum of 200,000 population (4–2–1) have elected to utilize the commission form of local government and presumably each nominates and elects its governing officials in the same manner that Cairo does.

The development of commission form of city government and its companion, manager administration, were the reform development of small businessmen according to James Weinstein.[1] The first commission government occurred in Galveston, Texas, and followed the ruinous situation in which that city found itself after destruction by a great tidal wave. Looking upon the city as a great ruined business, a group of businessmen "followed the most efficient form of organization known to them: the business corporation." As adopted, the Galveston plan provided for a five man commission vested with the combined powers of mayor and board of aldermen. Each commissioner headed a city department and functioned as legislator and administrator. (This is essentially the situation under the Illinois statute.) Commission government spread rapidly and by 1913 over 300 cities had adopted a similar plan which now had become known for some reason as the "Des Moines Plan." Indeed, "their efforts bore fruit when an act passed the Pennsylvania legislature *requiring* all cities of the third class to adopt commission charters." Weinstein at 99. (Emphasis in the original.)

---

1. James Weinstein, The Corporate Ideal in the Liberal State 1900–1918, Beacon Press, Boston (1968). The material in the text of this dissenting opinion is taken from Chapter Four: The Small Businessman as Big Businessman: The City Commission and Manager Movements, p. 92 *et seq.*

According to historian Samuel P. Hays,[2] reform in the Progressive Era involved substantial debate over the system of representation. "The ward form of representation was universally condemned on the grounds that it gave too much influence to the separate units and not enough attention to the larger problems of the city." It was argued that in city-wide representation elected officials could consider the city as a unit. Conversely, "pre-reform officials spoke for their constituencies, inevitably their own wards which had elected them, rather than for other sections or groups of the city." Hays at 157.

While the so-called reform movement undoubtedly had as motivational factors desires to eliminate what might be termed provincialism as well as corruption and to promote efficiency in municipal government, the commission plan, over and above certain rather obvious limitations,[3] although constituting democracy in the Websterian sense of rule of the majority, rather clearly excluded segments of the populace from participation in the political process. This did not go unnoticed at the time.

"Other opponents, particularly political machines in Northern cities, Socialists, and trade unionists, had more specific grievances. Their fears and opposition came from a belief that the commission and manager charters would, by design or not, eliminate workers or their representatives from active participation in the process of government.

\* \* \* \* \* \*

"Three major features of the plans bore the brunt of Socialist criticism: the elimination of ward representa-

tion, which meant the end of minority representation." Weinstein at 107.

"The nonpartisan ballot, a feature of most commission-manager plans and widely heralded as a great advance in democracy, also tended to operate against minority groups." Weinstein at 110.

"There were many, besides the Socialists, who thought commission government had already changed the system of representation and had guaranteed business rule. Most of these men did not oppose the new plans *in toto*, but only wished to assure that the commissions reflect the makeup of the entire community. To this end, they proposed proportional representation in the elections to the Commission, and revived the Proportional Representation League to lead the fight." Weinstein at 112.

"In Dayton, where opposition to the unrepresentative council developed rapidly after the adoption of the manager charter, proportional representation failed because business groups opposed a reform which they believed could benefit only Socialists and Negroes." Weinstein at 113.

"Although reformers used the ideology of popular government, they in no sense meant that all segments of society should be involved equally in municipal decision-making. They meant that their concept of the city's welfare would be best achieved if the business community controlled city government. As one businessman told a labor audience, the businessman's slate represented labor 'better than you do yourself.'" Hays at 154.

"Lower- and middle-class elements felt that the new city governments did not represent them." Hays at 164.

---

**2.** Samuel P. Hays, The Politics of Reform in Municipal Government in the Progressive Era, published in Volume Two, Stanley N. Katz and Stanley I. Kutler, New Perspectives on the American Past, Little Brown (1969), pp. 148–171. The article was reprinted by permission from Pacific Northwest Quarterly, LV (October 1964), pp. 157–169.

**3.** In Galveston, the original plan provided for the appointment of all five commissioners. A court decision subsequently held appointive government unconstitutional. "In Houston, the second commission city, a poll tax of $2.50 limited democracy by eliminating 7,500 'irresponsible' voters in a potential electorate of 12,000." Weinstein at 108.

"The success of the drive for centralization of administration and representation varied with the size of the city. In the smaller cities, business, professional, and elite groups could easily exercise a dominant influence. Their close ties readily enabled them to shape informal political power which they could transform into formal political power." Hays at 164.

"While reformers maintained that their movement rested on a wave of popular demands, called their gatherings of business and professional leaders 'mass meetings,' described their reforms as 'part of a worldwide trend toward popular government,' and proclaimed an ideology of a popular upheaval against a selfish few, they were in practice shaping the structure of municipal government so that political power would no longer be broadly distributed, but would in fact be more centralized in the hands of a relatively small segment of the population." Hays at 167.

Shifts in urban populations and migrations of well-defined ethnic, economic, or racial groups both to and from cities may have changed the identity of those who may be denied meaningful participation in the political processes but this would merely mean that there has been a substitution of the minority group.

Because of the inherent probability of this exclusion in the at-large election situation, it reasonably might have been assumed that the attack would be launched in the case now before this court on the root of the political famine in which the Cairo blacks find themselves. Such is not the case. Instead appellants assert that the Illinois statute is not *per se* unconstitutional.[4]

The reluctance to mount a facial attack on the statute may well have resulted from the cases on which the appellants placed their reliance, principally

*White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). These cases and their predecessors make it clear that multimember districts are not *per se* unconstitutional. Constitutional deficiency under the Equal Protection Clause of the Fourteenth Amendment is not brought about "simply because the supporters of losing candidates, have no legislative seats assigned to them." *Whitcomb, supra,* at 160, 91 S.Ct. 1858, 29 L.Ed.2d 363.

Further, the teaching of *Fortson v. Dorsey,* 379 U.S. 433, 438, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), and *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), that when an official's tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county and not merely the people in his home district is shown to have continuing viability in the recently decided *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975).

In the present case, the appellants challenged the constitutionality of the Illinois statute under both the Fourteenth and the Fifteenth Amendments but the primary basis of attack appears to be because of the dilution-equal protection principles found in the line of cases exemplified by *White* and *Whitcomb.* Judicial reluctance to invalidate on equal protection grounds an underlying statute not unconstitutional in its inception is demonstrated by this language from *Paige v. Gray,* 399 F.Supp. 459, 465 (M.D.Ga.1975):

"This court has not found nor has counsel suggested an appellate or Supreme Court decision in which an election scheme enacted some 28 years ago and not otherwise unconstitutional, has been determined to be violative of the equal protection clause because of the conduct of the public officials

---

4. The commission form of local government resisted a constitutional attack in *People v. Edmands,* 252 Ill. 108, 96 N.E. 914 (1911). Needless to say, the attack was mounted on

substantially different lines than those found in recent judicial decisions dealing with the election processes.

elected under the 28 year old scheme. If the equal protection clause were so interpreted, the United States courts would be continuously called upon to determine the present fairness towards all racial elements of all existing election schemes of our 50 states and thousands of local governments regardless of how long those schemes may have existed and regardless of whether or not when enacted they impinged upon the constitutional rights of the citizenry. United States courts would indeed supplant all legislative judgment."

Finally, a broadside attack by the plaintiffs on the Illinois statute, facially at least, would have been to have put themselves on the tortuous and often frustrating path of three-judge court procedure. The appellants therefore have sought to make this suit purely one of local concern which could properly be brought before and disposed of by a single district court judge. The district court agreed with the appellants on this phase of the case as did the majority in this court. My dissent is based upon my disagreement. I would not disagree that the determination of whether an action of the type here involved should require a three-judge court is not one easy of solution and judicial language supporting either position on the subject is easily citable. One preliminary principle, however, should not be too arguable and that is that the facts of the individual case must be the basis for the determination.

In simple terms, the plaintiffs' complaint seeks an injunction requiring a ward plan of voting in Cairo which would be of necessity based upon a declaratory judgment that the Illinois statute was "unconstitutional *as applied* in Cairo, Illinois." (Emphasis supplied.) While there may have been a question at one time, three-judge court jurisdiction is mandated just as much in the "applied" case as it is when the attack is a facial one. The applicable law is succinctly stated by Mr. Justice Brennan in a footnote in *Steffel v. Thompson*, 415

U.S. 452, 457 n. 7, 94 S.Ct. 1209, 1214, 39 L.Ed.2d 505 (1974), as follows:

"Since the complaint had originally sought to enjoin enforcement of the state statute on grounds of unconstitutionality, a three-judge district court should have been convened. See 28 U.S.C. § 2281; *Goosby v. Osser*, 409 U.S. 512 [93 S.Ct. 854, 35 L.Ed.2d 36] (1973); *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715 [82 S.Ct. 1294, 1296, 8 L.Ed.2d 794] (1962). A three-judge court is required even if the constitutional attack—as here—is upon the statute as applied, see *Department of Employment v. United States*, 385 U.S. 355 [87 S.Ct. 464, 17 L.Ed.2d 414] (1966); *Query v. United States*, 316 U.S. 486 [62 S.Ct. 1122, 86 L.Ed. 1616] (1942); *Ex parte Bransford*, 310 U.S. 354, 361 [60 S.Ct. 947, 951, 84 L.Ed. 1249] (1940); see generally Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 37–50 (1964); and is normally required even if the decision is to dismiss under *Younger-Samuels* principles, since an exercise of discretion will usually be necessary, see *Jones v. Wade*, 479 F.2d 1176, 1180 (CA5 1973); *Abele v. Markle*, 452 F.2d 1121, 1125 (CA2 1971); see generally Note, The Three-Judge District Court: Scope and Procedure Under Section 2281, 77 Harv.L.Rev. 299, 309 (1963). But since petitioner's request for injunctive relief was abandoned on appeal, see n. 6, *supra*, and only a request for declaratory relief remained, the Court of Appeals did not err in exercising jurisdiction over the appeal. *Cf. Roe v. Wade*, 410 U.S. 113, 123 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973); *Mitchell v. Donovan*, 398 U.S. 427 [90 S.Ct. 1763, 26 L.Ed.2d 378] (1970); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 152–155 [83 S.Ct. 554, 559–561, 9 L.Ed.2d 644] (1963); *Stratton v. St. Louis S. W. R. Co.*, 282 U.S. 10, 16 [51 S.Ct. 8, 10, 75 L.Ed. 135] (1930)."

The majority opinion in the present case also disposes of the three-judge court issue in a footnote. Reliance is

placed upon *Ex parte Bransford*, 310 U.S. 354, 361, 60 S.Ct. 947, 951, 84 L.Ed. 1249 (1939), which case distinguishes between a petition for injunction on the ground of the unconstitutionality of a statute as applied, which requires a three-judge court, and a petition which seeks an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional. The latter petition is categorized by the Court as being aimed "at an allegedly erroneous administrative action," whatever that phrase may mean.

As an initial matter, serious doubts about the correctness of *Bransford* are raised by a respectable authority in the field, Professor David P. Currie, of the University of Chicago, whose article on the subject, cited in the above quotation from *Steffel*, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 37–50 (1964) deals extensively with *Bransford* and its companion in arms, *Phillips v. United States*, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941). "The doctrines of *Phillips* and *Bransford* are vague and impracticable and have provoked a good deal of confusion in the lower courts." *Id.* at 38.

Little purpose except to lengthen unduly this dissent will be served by setting forth the author's penetrating analysis of the obfuscating semantical clouds created by *Bransford* and *Phillips*. It is enough to say that in my opinion Professor Currie's conclusion is fully justified:

"In order that the three-judge statute may be administered with a minimum of uncertainty and jurisdictional litigation, those decisions should be set aside and three judges required whenever 'the plaintiffs seek to enjoin the defendants . . . from doing what they [defendants] [reasonably] claim they are authorized and required to do by the Constitution and laws of the state.'" Currie at 50. (footnote omitted.)

Assuming arguendo, however, in view of the lack of Supreme Court repudiation of the "erroneous administrative ac-tion" concept of *Bransford* and the continuing citation of that case, that *Bransford* is viable in toto, I fail to see that it requires dispensing with a three-judge court in the present case. It is true that the plaintiffs insist rather strenuously that they fall within the wording of *Bransford* in that they are seeking "an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional." However, their disclaimer is belied by the result they seek which is squarely based upon a judicial determination that the statute is unconstitutional "as applied" in Cairo. This is not as the majority opinion suggests a case in which administrative order misinterpreting or distorting a valid state law results in a denial of equal protection. The defendants are applying the statute exactly as it is written and exactly as it is presumably being applied in 64 other communities. The statute does not appear to provide for discretionary variations to be determined by local officials. If the application results in unconstitutional action it must be because the statute upon which the action is taken is unconstitutional.

The defendants are exercising no discretion, administrative or otherwise. The only discretion being exercised is that of the voters who regrettably appear to vote consistently along color lines. While perhaps not directly bearing on the issue before us, it should be noted that assuming the complaint's claim of polarization being true and accepting that polarization is a dual process, the imposition of a ward arrangement would result in some of the wards in an exclusion of white voters from the political processes. The fault would appear to be undesirable human traits which runs deeper than the particular election system currently in use.

A second phase of the three-judge court situation requires consideration and that is that a purely local application does not trigger the necessity. Some of the language in *Moody v. Flowers*, 387 U.S. 97, 101–102, 87 S.Ct. 1544,

18 L.Ed.2d 643 (1967) might on first reading seem to support the position adopted by the district court and the majority of this court:

"The Court has consistently construed the section as authorizing a three-judge court not merely because a state statute is involved but only when a state statute of general and statewide application is sought to be enjoined. See, *e. g. Ex parte Collins,* 277 U.S. 565 [48 S.Ct. 585, 72 L.Ed. 990]; *Ex parte Public National Bank of New York,* 278 U.S. 101 [49 S.Ct. 43, 73 L.Ed. 202]; *Rorick v. Board of Commissioners of Everglades Drainage Dist.,* 307 U.S. 208 [59 S.Ct. 808, 83 L.Ed. 1242]; *Cleveland v. United States,* 323 U.S. 329, 332 [65 S.Ct. 280, 281, 89 L.Ed. 274]; *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 227–228 [84 S.Ct. 1226, 1231–1232, 12 L.Ed.2d 256]. The term 'statute' in § 2281 does not encompass local ordinances or resolutions. The officer sought to be enjoined must be a state officer; a three-judge court need not be convened where the action seeks to enjoin a local officer (*Ex parte Collins, supra; Rorick v. Board of Commissioners, supra*) unless he is functioning pursuant to a statewide policy and performing a state function. *Spielman Motor Sales Co. v. Dodge,* 295 U.S. 89 [55 S.Ct. 678, 79 L.Ed. 1322]. Nor does the section come into operation where an action is brought against state officers performing matters of purely local concern. *Rorick v. Board of Commissioners, supra.* And, the requirement that the action seek to enjoin a state officer cannot be circumvented 'by joining, as nominal parties defendant, state officers whose action is not the effective means of the enforcement or execution of the challenged statute.' *Wilentz v. Sovereign Camp, WOW,* 306 U.S. 573, 579–580 [59 S.Ct. 709, 713, 83 L.Ed. 994]."

In *Moody,* however, one of the cases involved only a local charter and the other although directed to a state statute concerned one which dealt with apportionment and districting for one county's governing board. In the case before us, the state statute is "of general and statewide application." While local officers are involved they are "functioning pursuant to a statewide policy" and performing a function in accordance with the statute of statewide application.

An examination of the voting cases indicates that those in which a three-judge court were held not to be necessary did in fact only involve a local situation even though an act of the legislature was concerned. Thus in *Dove v. Bumpers,* 497 F.2d 895 (8th Cir. 1974), remanding 364 F.Supp. 407 (E.D.Ark. 1973), a three-judge court decision, the court of appeals pointed out that although the statute was couched in general terms, it applied exclusively to two cities in the state. Even so the court stated the question was not without difficulty. In *Paige v. Gray, supra,* the state statute dealt specifically with municipal elections in Albany, Georgia. Some of the election cases do not appear to have considered the problem at all. Others, particularly those from the Fifth Circuit, have developed from court sponsored local plans devised to implement constitutional principles. See, *e. g., Bradas v. Rapides Parish Police Jury,* 508 F.2d 1109 (5th Cir. 1975). Another type of case which would appear to be purely local would be if the state constitution or a state statute permitted a local community to devise its own home rule plan. That, of course, is not the situation here where the commission plan is set forth in detailed terms in the statute and is uniformly applicable to all communities voting to adopt the plan.

The majority opinion may be arguably correct in stating that the plaintiffs' complaint focuses only on the choice made by Cairo. The plaintiffs clearly attempted so to confine their focus. But this attempted focusing does not support the next observation in the majority opinion that if the plaintiffs succeed after trial, "there would be no impact beyond the city of Cairo." The impact

would be immediate and probably substantial upon the other 64 municipalities of Illinois which have adopted the commission form of local government. I am unable to believe that in each of these there is not some minority group that is not represented in the city governing body but would be if the election of the commissioners was by wards.

The resulting impact is aptly described in *Whitcomb v. Chavis, supra,* 403 U.S. at 156–57, 91 S.Ct. at 1875:

"The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, is not easily contained. It is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Marion County who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas. Indeed, it would be difficult for a great many, if not most, multi-member districts to survive analysis under the District Court's view unless combined with some voting arrangement such as proportional representation or cumulative voting aimed at providing representation for minority parties or interests. At the very least, affirmance of the District Court would spawn endless litigation concerning the multi-member district systems now widely employed in this country." (Footnotes omitted.)

Where a statute embodies a policy of statewide concern—here the uniform provisions for municipal government by at-large elected commissioners—an officer, although chosen in a political subdivision and acting within that limited territory, may be charged with the duty of enforcing the statute in the interest of the state and not simply in the interest of the locality where he serves. *Spielman Motor Co. v. Dodge,* 295 U.S. 89, 94, 55 S.Ct. 678, 79 L.Ed. 1322 (1935). As in *Spielman* in the present case "it is manifest that the statute under attack attempted to establish a state-wide policy, and not one merely in the interest of a particular county." *Id.* at 95, 55 S.Ct. at 680.

While there might be substantial doubt whether the courts should undertake the task of mandating what would appear to be proportional representation in a small community, and increased doubt where the multimember district concededly was not designed by the legislature nor adopted by the municipality for the purpose of diluting the votes of minorities, see *Whitcomb v. Chavis, supra,* 403 U.S. at 149, 91 S.Ct. 1858, nevertheless, I am unable to say that the matter of lack of constitutionality is so insubstantial as to justify dismissal by a single district judge. The merits, in my opinion, should not be explored farther than that by this court at this time. I do say, however, that the resolution of the constitutional question here should be by a three-judge court. In so saying, I am not unmindful that the three-judge court procedure does not enjoy extensive judicial favor today. Nevertheless, while it remains as a part of the federal jurisdictional scheme, it should be utilized where it is required. To paraphrase *White v. Regester, supra,* 412 U.S. at 760, 93 S.Ct. 2332 at 2336, that a court declares a statewide election plan invalid, but enters an injunction only as to one city, "in no way indicates that the case required only a single judge."

Accordingly, consistently with *Idlewild Liquor Corp. v. Epstein,* 370 U.S. 713, 82

S.Ct. 1294, 8 L.Ed.2d 794 (1961), and its progeny,[5] I would remand the case to the district court so that a three-judge court could be convened.

---

5. See David P. Currie, Appellate Review of the Decision Whether or Not to Empanel a Three-Judge Federal Court, 37 U.Chi.L.Rev. 159 (1969).