Jose ARANDA, Ralph Arriola, Hector Barragan, Ruth Estrada, Jess Margarito, Sylvester Moreno, Barbara Parra, and Louis Vargas, Plaintiffs,

v.

J. B. VAN SICKLE, Phillip Johnson, Paul Macy, Quentin Johnson, Perry Harris, and Helen Ramsey, Defendants.

No. CV 74–551–JWC.

United States District Court,
C. D. California.

July 15, 1976.

Joaquin G. Avila, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., Frank Cronin, Mexican American Legal Defense and Educational Fund, Los Angeles, Cal., Jose A. Garza, San Fernando Valley Neighborhood Legal Services, Pacoima, Cal., Vilma S. Martinez, Sanford J. Rosen, San Francisco, Cal., Joaquin G. Avila, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., for plaintiffs.

John A. Lewis and Bill J. Thompson of Lewis, Varni & Ghirardelli, San Fernando, Cal., for defendants.

## MEMORANDUM OPINION

CURTIS, District Judge.

The plaintiffs are Mexican American residents of the City of San Fernando. They bring this action on behalf of themselves and all other Mexican American residents of that city. They seek declaratory and injunctive relief against the defendants who are members of the City Council of the City of San Fernando, claiming that the "at-large" election method utilized by that city in their municipal elections in selecting members to the Council is unconstitutional because it "arbitrarily and capriciously cancels, dilutes, and minimizes the force and effect of the voting strength of plaintiffs and the classes which they represent and, consequently, violates plaintiffs' right to equal protection of the laws and their right to vote pursuant to the fourteenth, fifteenth, nineteenth and twenty-sixth amendments of the United States Constitution."

---

\* See, e. g., Commonwealth Oil Refining Co., Inc., 2 FEA Par. 83,064 (March 12, 1975); New England Petroleum Corp., 2 FEA Par. 83,136 (May 2, 1975).

It is well established, indeed, the plaintiffs do not argue to the contrary that an "at-large" election method of selecting councilmen is not per se unconstitutional. At the same time, such a system of election may be implemented in such fashion as to invidiously cancel out or minimize the voting strength of racial groups. The fact, however, that the Mexican American voters have not had seats on the Council in proportion to its voting potential, in and of itself, is not enough to establish racial group discrimination. As the Supreme Court said in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973):

> "The plaintiffs' burden is to produce evidence to support findings that the political process leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. 766, 93 S.Ct. 2339.

The defendants contend that the voting scheme provides equal and open access to the voters of San Fernando to the political processes of the City and that the inquiry need go no further.

Although a system may be neutral on its face as, in my view, the San Fernando system is, it may, nevertheless, operate to dilute, minimize or cancel out minority voting strength in a manner and to an extent violative of constitutional guarantees. In determining whether it does or not, as the court said in *Kendrick v. Walder*, 527 F.2d 44 (7th Cir. 1975):

> "The analysis . . . does not stop with a consideration of whether the one-man, one-vote ideal has been achieved, but reaches beyond mathematical equality to see if the group in question can obtain effective representation within the electoral system as it operates. This is not to suggest that the designation of seats for minority representatives in proportion to their voting strength is compelled (or even permitted) by the equal protection clause, but if, as a result of the

method of apportionment, the group is disadvantaged in its use of the ballot, an equal protection claim may exist. *White v. Regester, supra; Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965)." 527 F.2d 48.

Plaintiffs contend that the voting scheme as implemented does in fact cancel, dilute and minimize the force and effect of the voting strength of the plaintiffs and the members of the class which they represent. In support of this contention, plaintiffs set forth several factual situations upon which they rely to support these conclusions, each of such factual situations will be discussed seriatim.

## I. THE CITY'S HISTORY OF RACIAL DISCRIMINATION

Plaintiffs point out that almost since its inception, the City has been divided into separate communities, the Anglo community and the Mexican American community, a division which has been both geographical and cultural. Racially restrictive covenants were utilized in deeds preventing non-whites from living in certain portions of the City until 1948 when the Supreme Court, in *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), declared such covenants unconstitutional. This has resulted in the creation of a Mexican section of the City which plaintiffs refer to as the "barrio". Plaintiffs also refer to a series of newspaper accounts appearing periodically from February 7, 1913 to June 1, 1923, which plaintiffs characterize as a portrayal of Mexicans in negative terms. From these facts, plaintiffs argue that the City is today racially polarized into the Anglo faction and the Mexican faction.

No one would deny that up until fairly recently, discriminatory practices were rampant not only in San Fernando but throughout the entire country. But it is equally apparent that certainly within the last twenty years the American people as a whole have developed a sensitiveness to the

rights, privileges ·and opportunities of minorities. The practice of using discriminatory covenants in deeds which was prevalent throughout the country many years ago was terminated in 1948, and the last newspaper article with racial overtones referred to by the plaintiffs was published in 1923. In my view, even though these facts be true, they do not in any way support the contention that the City today, is or has, at any time in the recent past, been racially polarized.

## II.  PRESENT INDICIA OF RACIAL POLARIZATION

Plaintiffs contend that the Mexican American community today is still concentrated in the "Mexican quarter" and suffers from poverty, lack of education, and jobs.

Although these facts may be true, these do not necessarily indicate that the City is racially polarized. There is no member of the Mexican American community who could not move and live any where in the City of San Fernando he wishes, provided he could afford to do so. The reason the members of the community remain where they are is by choice or economic necessity. There is little doubt but that the barrio has many undesirable characteristics. Old, cheap houses in a densely populated area, lacking modern conveniences, housing people below the low poverty level, many unemployed, where education levels are low and whole household occupation is dense. Such conditions, assuming that they do in fact exist, are of course deplorable and it is incumbent upon a city government in the interest of humanity to do what it can to improve them. But these are social problems which, to a greater or lesser extent, face all communities and are problems which arise because local governments have not always been able to successfully accommodate the economically and educationally disadvantaged who constitute a portion of their citizenry. Insofar as the City of San Fernando is concerned, there is nothing in the record to indicate that race plays any role in the problem. The underprivileged, be they white, brown or black, suffer the same unhappy fate, and the fact that there may be a concentration of underprivileged persons along racial lines is likely to be the result of individual desire to associate with those of similar racial background and economic status. In any event, such concentrations cannot in any way be traced to city government.

## III.  RACIALLY POLARIZED VOTING

Plaintiffs urge that although the Mexican American voters tend to vote for Mexican American candidates, they are unsuccessful in electing any. They point out that only three candidates with Mexican surnames have been elected to the City Council since 1911. However, this is undoubtedly due to the very low Mexican American participation in the electoral process. Although they constitute 48.7% of the City's population, the highest percentage of registrations they were able to obtain, insofar as the record before us reveals, was in the year 1972 when 28.7% were registered to vote. Rather than attributing this low voter registration to political apathy, plaintiffs blame it upon the fact that the electoral process is in English and is therefore somewhat confusing to the Mexican American population. The fact remains that although the electoral process is open to Mexican Americans to the same extent that it is open to others, the failure of this group to elect one of their own members to office can be attributed largely to their own lack of participation in it.

## IV.  DISCRIMINATORY CAMPAIGN TACTICS

Plaintiffs relate that in two major elections where Mexican Americans have conducted a highly publicized campaign, newspapers and incumbents have appealed to the racial fears of the Anglo community. The article quoted in plaintiffs' Memorandum of Points and Authorities as proof of this contention does not support such an allegation. It contains no reference to race, either express or implied, and it clearly challenges the candidate as an individual who participated in a recall endeavor which

the editorial writer characterized as an attempt to "wreck the protection of civil service."

Plaintiffs further complain that the campaign efforts of the Mexican American candidates were seriously undermined by the City Clerk's office which, prior to the election, issued charges of alleged voter registration irregularities. If such irregularities existed, the City Clerk had the right, as well as the duty, to announce them. There is no indication in the record here that the charges were unfounded nor that they were directed to the Mexican American community.

In that campaign the mayor took an active part, apparently branding the Mexican American candidates as "activists." The only racial implication which the plaintiffs find is that the mayor was probably referring to the La Raza Unida Party and their program to register Mexican Americans in the barrio. Even if plaintiffs' assumptions are true, this organization is politically activistic and an attack upon it is no more evidence of racial polarity than an attack upon the John Birch Society.

Plaintiffs allege in a general way that some incidences of police harassment at the poles and activities on the part of some election officials discouraged Mexican Americans from voting. These allegations are vague, indefinite and conclusionary. But even if some such occasions did occur, although unfortunate, there is no showing that these were more than a few isolated incidents which fall far short of establishing a pattern from which an inference of voter polarization may be drawn.

## V. THE CITY'S RESPONSIVENESS

As further proof of the plaintiffs' contention that the voting scheme as implemented tends to dilute the voting strength of the class whom they represent, they urge that although the problems of the barrio are such that only residents of the barrio can understand them, neither the mayor nor members of the City Council have in the past ten years resided in the barrio tract. Furthermore, only a relatively few persons who make up the various committees and commissions live in the barrio. Also, plaintiffs point to the City's employment record as indicative of the City's nonresponsiveness. This indicates that Mexican Americans are employed primarily in the nonprofessional catagories and are found to be located in the low scale salary ranges.

If, as plaintiffs contend, the barrio is populated predominantly by people in the low income and poverty level, where there is high unemployment and low levels of education with relatively low civic awareness as indicated by the percentage of registered voters in that area, one would not expect to find therein many people with the leisure time, the interest, nor the financial support which would enable them to run for public office or would permit them to participate in civic affairs to the extent that their selection on commissions and committees would be likely. Furthermore, with the low level of education which plaintiffs describe, it is not surprising that the members of the barrio find employment predominantly in nonprofessional catagories with the attendant lower scale salary ranges.

Plaintiffs point specifically to their lack of representation on the City Redevelopment Agency and suggest that as a result the agency attempted to demolish some of the buildings in the barrio and to build a multi-unit building which was opposed by the residents because they feared they would lose their homes. It is quite obvious that the City, through the Redevelopment Agency, was attempting to remove some of the blight of which the plaintiffs complain and that the residents objected for fear they would lose their substandard housing which plaintiffs would have us believe was being forced upon them. It is not at all clear just what position the plaintiffs would have a representative, completely responsive to the wishes of the residents of the barrio, take with respect to the City's Redevelopment Program. Would they want the barrio cleaned up or not?

These facts even if true do not support the inference that the city government is less responsive to the Mexican American

citizens than to any other segment of the community.

## VI.   CITY POLICY INADEQUATE TO SUPPORT LARGE ELECTIONS

The plaintiffs have suggested that the reasons given by the City for maintaining the at-large election scheme is inadequate and is in fact an insult to the Mexican American community. The reason for such election scheme was set forth in a letter to State Assemblyman James Keysor as follows:

> "However, in some cities the use of districts would not only artificially limit qualified people from serving on city councils but would make it difficult for some cities to recruit candidates in every district which is necessary for meaningful choice by the voters."

San Fernando is a relatively small, compact city covering an area of approximately two square miles and having a population of approximately 17,000 persons. The reason given by the City under the circumstances, therefore, appears to be reasonable and certainly not arbitrary or capricious.

## VII.   CONCLUSION

It is axiomatic that whenever a claim is made that a city government is being administered in such a manner as to invidiously dilute the voting power of a racial minority within its boundaries, it is the duty of the courts, with a zealous desire to protect the rights of such minorities, to carefully examine the evidence in order to recognize and prohibit such practices as are found to be constitutionally impermissible, no matter how subtly they may appear.

But the task also requires a perceptiveness which will enable the court to distinguish between repressive political phenomena rooted in racial considerations and that which is a natural consequence of the exercise by the majority of its legitimate power as such in a democratic society.

Plaintiffs' facts appear to fall in the latter category. The City plan is such as to allow all persons irrespective of race to participate in the governing process on an equal basis according to their wishes and their ability. The failure of persons in the class which plaintiffs represent to participate in city government has been due to apathy, lack of education, training and experience, lack of economical support, and other similar reasons which are applicable to all persons irrespective of race but who are otherwise similarly situated. Plaintiffs have simply failed to allege any facts to support their contention that the City's governmental plan as implemented has brought about any dilution of the voting power of its Mexican American citizens as a class. They are, therefore, not entitled to succeed in these proceedings.

It is true, of course, that the plaintiffs seek further discovery. In fact, the discovery which plaintiffs propose is so vast and extensive that if allowed it would impose an almost impossible burden upon the City. But, plaintiffs have been unable to give this court any assurance that the results would be other than cumulative or that they would be more pertinent than the facts thus far set forth in the record.

I find, therefore, assuming *arguendo*, that all the facts alleged by the plaintiffs are true, they do not support plaintiffs' conclusions which form the basis of their claims. I further find that there is no substantial issue of fact which remains to be litigated, and that defendants are entitled to a judgment as a matter of law. Defendants' motion for summary judgment will therefore be granted.