Jose ARANDA et al.,
Plaintiffs-Appellants,

v.

J. B. VAN SICKLE et al.,
Defendants-Appellees.

No. 77–2714.

United States Court of Appeals,
Ninth Circuit.

July 12, 1979.

**1268**

Joaquin G. Avila, Mexican-American Legal Defense & Educational Fund, San Antonio, Tex., for plaintiffs-appellants; Morris Baller, Mexican American Legal Defense & Educational Fund, San Francisco, Cal., argued.

John A. Lewis (argued), Lewis, Varni & Ghirardelli, San Fernando, Cal., for defendants-appellees.

Before BARNES and KENNEDY, Circuit Judges, and VOORHEES, District Judge.[*]

BARNES, Senior Circuit Judge:

This is an appeal from the granting of a motion for summary judgment made by the defendants, who were once members of the city council, and the Mayor, of the City of San Fernando, California.

The district court found that the plaintiffs, members of the San Fernando Mexican-American community, who brought this class action under 42 U.S.C. § 1983, had failed to establish that the at-large election scheme used by the City of San Fernando to elect its city council was unconstitutional under the Fourteenth, Fifteenth, Nineteenth, and Twenty-sixth Amendments to the United States Constitution.

[*] Honorable Donald S. Voorhees, District Judge, Western District of Washington, sitting by designation.

## I. FACTS:[1]

The City of San Fernando, which has a population of 16,500, was incorporated in 1911 under California Government Code Section 34102. It has used an at-large election scheme under California Government Code Section 36503 or its predecessors in selecting its members of the five-person city council since that time. Council members are elected for terms of four years. The mayor is selected from among the council members.

Since 1911 only three Mexican-Americans have been elected to the city council despite the fact that Mexican-Americans comprise approximately fifty percent of the population. Because of this, plaintiffs, all members òf the Mexican-American community and some of whom ran for the city council and lost, bring this class action alleging that they have been denied equal protection.

Plaintiffs contend that San Fernando is racially polarized. In support of this proposition they present certain historical data: old newspaper articles with racist overtones, and deeds which contain racially restrictive covenants until these covenants were declared unconstitutional by the Supreme Court in 1948 in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

The city is divided into geographically separate communities. Census tract 3202 which is known as the barrio contains 37% of the total city population. However, the tract contains 80.1% of the population with Spanish surnames. The tract has a higher density, more children per woman, fewer high school graduates, higher unemployment, more low income families and families below poverty level, than the rest of the city. In short, the barrio is a geographically distinct community which is organized along racial lines.

Although Mexican-Americans comprise 48.9% of the population (1970 census), they

1. We adopt as facts those which, fairly read, are most supportive of appellants' position.

comprised only 28.7% of the registered voters in 1972. Voting appears to follow racial lines, that is members of the white community vote for white candidates while members of the Mexican-American community vote for Mexican-American candidates. Neither members of the city council nor the mayor have lived in the barrio for the ten years prior to the institution of this suit.

During the 1972 elections certain members of the Mexican-American community were subjected to harassment by the police. Specifically, certain Mexican-American poll watchers were followed by the police to different polling places and questioned intensively despite the fact that the poll watchers had a right to be at the polls and were operating with the knowledge of the city clerk. In addition, private homes of white citizens are often used as polling places: in 1972, 5 out of 15 polling places were located in public buildings; in 1970, 7 out of 13 polling places were located in public buildings; and in 1964, 3 out of 27 polling places were located in public buildings. The private homes which were used were invariably not Spanish-surnamed households. The percentage of Spanish-surnamed persons participating in the mechanics of operating the election was also low. In 1976 only 6% of the inspectors and 13% of the judges had Spanish surnames.

Mexican-Americans were also sparsely represented on 18 city commissions. None of the city commissions had 50% Mexican-American membership. Over the 10 years prior to the institution of this suit, 6 of the city commissions had no Spanish-surnamed appointees and the Planning Commission had only 3 members who were barrio residents during those ten years. The following commissions had from 6% to 18% Spanish-surnamed membership: Citizens Committee on Redevelopment, Community Cultural Development, Lopez House, Personnel Board, Planning Commission and Steering Committee—Recreation Park Issue. The city employed 35 Spanish-surnamed persons in 1974 in contrast to 92 whites and the vast majority of the Spanish-surnamed persons were the lower paid employees.

Plaintiffs also allege that the city is not responsive to the needs of the Mexican-American community. As specific examples the Newville-Meyer General Plan which would have expanded a street in the barrio and, so the residents felt damaged the "residential integrity" of the barrio; a high-rise apartment complex proposed by the city which would have forced low income Mexican-Americans from the city, and the failure of the city to place a stoplight at a street intersection located in the barrio despite the fact that many accidents had occurred at the intersection.

Plaintiffs also state that discriminatory campaign tactics were used in elections in which there were strong Mexican-American candidates. In support of this they quote from a 1954 editorial which appeared in the San Fernando Sun. They allege the article which attacked Jose Aranda, a Mexican-American's candidacy, was racially oriented. The article stated:

"For the record . . . on June 8, 1951, JOSE ARANDA (together with Lee Ward, Sam Richardson, Gilbert Dotson, Robert Martinez and John Anderson), signed the official 'notice of intention to recall' 'Herb' Martin . . . one of the finest city councilmen we have ever had.

"For the record . . . JOSE ARANDA was the president of the so called 'Civil Betterment League' which backed Smith, Schofield and Padilla . . . which tried to wreck the protection of civil service . . . which published the 'Bulletin.' "

In 1972, Jess Margarito, Richard Corona, and Alfred Bernal were the Mexican-American candidates for the city council. At that time an extensive voter registration drive was initiated by the Mexican-American community. As a result of this drive, 28.7% of all voters were Spanish surnamed. Just prior to the election, the city clerk issued statements concerning alleged voter registration irregularities. The incumbent mayor then issued a press release in which he stated:

"Obviously our city election offers an enticing target to any outside organized group who needs a base of operations for their form of political activism. I believe it to be part of a State-wide trend whereby activists are attempting to wrest control of as many city governments in California as they possibly can from those they brand as 'Establishment.' They seek to gain entry into our houses of government that they may throw wide the doors to their followers who are waiting at the gates to join in the disruption of our orderly governmental processes. Their goal is chaos in government."

Plaintiffs allege that the statement concerning outside political agitators was an obvious reference to the La Raza Unida Party, a Mexican-American organization, which had conducted the voter registration drive. Whether the statements were designed to spread racist fears or not, the largest number of people turned out to vote in a city election in San Fernando history.

The City of San Fernando in a letter to its California assemblyman has justified its preference for at-large elections in this manner:

"District elections in some cities are desirable and exist in these cities where residents have *voted* to use them. However, in some cities, the use of districts would not only artificially limit qualified people from serving on city councils, but would make it difficult for some cities to recruit candidates in every district which is necessary for meaningful choice by the voters."

Plaintiffs contend that this statement is tantamount to saying that the statement must be taken to express doubt that qualified Mexican-American candidates from the barrio will present themselves and take issue with the statement.

## II. *ISSUES*

1. Does the "at large" election method used by the City of San Fernando in electing members of the city council violate plaintiffs', Mexican-American voters', right to equal protection and right to vote under the Fourteenth, Fifteenth, Nineteenth and Twenty-sixth Amendments of the United States Constitution?

2. Did the district court err in its determination that there was no genuine issue of material fact present in this case and that viewing the evidence in the light most favorable to the plaintiffs, summary judgment in favor of the defendants should be granted as a matter of law?

Inasmuch as this is an appeal from the granting of a motion for summary judgment, we turn to the record to ascertain if the proceedings below complied with Rule 56 of the Rules of Civil Procedure. The court's Findings of Fact and Conclusions of Law appear at pages 1245–1249, Vol. V (or IV A) of the Record on Appeal, and appear in the attached Appendix A. The district court judge found there was no material issue of fact remaining to be litigated.

Thereafter a Memorandum Opinion was filed by the district court judge. It appears at pages 1171 to 1180 in Vol. V (or IV A) of the Record. The trial judge's opinion is published in 455 F.Supp. 625.

Because this is an appeal from a complaint charging invidious discrimination against a *municipal* government, we find ourselves in a legal area (once described as a "mathematical quagmire"), with no precise guidelines from the Supreme Court. *See Wise, Mayor v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).[2]

---

**2.** Apparently no Supreme Court case has ever explicitly held that an at-large system for election of members of a city's council is unconstitutional.

"[W]e have never had occasion to consider whether an analogue of this highly amorphous theory (of *White v. Regester*, 412 U.S. 755, 765, [93 S.Ct. 2332, 37 L.Ed.2d 314]

(1973)) may be applied to municipal governments. . . .

"[W]e need not today consider whether relevant constitutional distinctions may be drawn in this area between a state legislature and a municipal government."
98 S.Ct. at 2502. Concurring opinion, Rehnquist, J.

## III. *CONCLUSION*

■ We are satisfied that the summary judgment granted by the District Court was properly granted, inasmuch as the plaintiffs failed to raise a genuine issue of material fact indicating that they have been denied access to political process (*i.e.,* to register, to vote, to be candidates for public office, to campaign for office, to participate in the selecting of candidates, or to hold office), or that the San Fernando elections for City Council were "conceived or operated as purposeful devices to further racial [or economic] discrimination." *Whitcomb v. Chavis,* 403 U.S. 124, at 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). The defendants were hence entitled to summary judgment as a matter of law.

To paraphrase the Supreme Court in *Whitcomb,*

"Nor does the fact that the number of ghetto residents who were legislators was not in proportion to ghetto population satisfactorily prove invidious discrimination absent evidence and findings that ghetto residents had less opportunity than did other [City of San Fernando] residents to participate in the processes and to elect [councilmen] of their choice." (*Id.* at 149), 91 S.Ct. at 1872.

Again to paraphrase the words of Mr. Justice White in *Whitcomb v. Chavis, supra* :

"The mere fact that one interest group or another concerned with the outcome of . . . elections has found itself outvoted and without . . . seats of its own provides no basis for involving constitutional remedies, where, as here, there is no indication that this segment of the population is being denied access to the political system." (*Id.* at 154–155, 91 S.Ct. at 1875).

Here we have in the record no protracted history of racial discrimination affecting or touching a minority's ability to participate in the electoral process (such as segregated schools, tests to qualify voters, or refusal to register Mexican-Americans) which are the background of many cases arising out of the Fifth Circuit. *See Zimmer v. McKeithen,* 485 F.2d 1297 (1973) where it was held a "panoply of factors" may be introduced to prove the fact of dilution, which is established "upon proof of the existence of an aggregate of these factors." (*Id.* at 1305).

■ The defendants question the weight of any discernible aggregation of factors. They assert, for example, that the small size of the city—both in area—(2.1 sq. mi.) and in population (16,751 at the time of trial) militate against multi-district elections. We agree with appellants there is no *per se* rule against multi-district elections because of physical size or size of population. But obviously, there comes a time when the rule of *de minimis* should be considered; and this factor of size or the lack of it, is one of the factors which is to be considered when determining the weight of the aggregate.

*Graves v. Barnes,* 343 F.Supp. 704 (1972), a 3-judge case, was reviewed by the Supreme Court *sub nomine White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1972). The Supreme Court found no invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment *solely* because there was a 9.9% variation between the number of voters in the largest and smallest district (412 U.S. 755, 761–764, 93 S.Ct. 2332); but that in Dallas and Bexar Counties there existed *more* than a mere variation between districts.[3] As to the two counties last named the essential proof to comply with plaintiff's burden of proof did exist—namely,

---

**3.** "The plaintiff's burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice *Whitcomb v. Chavis, supra,* [403 U.S.] at 149–150, [91 S.Ct. 1858.]" (*White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. at 2339).

that members of the swing group had "less opportunity than did other residents of the district to participate in the political processes and to elect legislators of their choice," pointing out that in the opinion in the District Court it had listed previous race discrimination in Texas.[4]

The Supreme Court then stated:

". . . These findings and conclusions are sufficient to sustain the District Court's judgment with respect to the Dallas multimember district and, on this record, we have no reason to disturb them." (Id. at 767, 93 S.Ct. at 2340)

As the *Graves v. Barnes, supra*, per curiam opinion states (following the principle of *Kramer v. Union Free School District*, 395 U.S. 621 at 626, 89 S.Ct. 1886, 23 L.Ed.2d 583):

". . . [W]hen a minority group is invidiously disadvantaged by the concomitance of poverty, past and continuing discrimination, a restrictive electoral system, and a peculiar districting scheme, which gives it 'less opportunity' to participate successfully, the Court will void such an apportionment scheme." (Id. at 732)

■ There seems little doubt that the plaintiffs herein represent a group which suffers poverty, but there is remarkably little,

and no substantial, proof in the record of past discrimination, no substantial proof of continuing discrimination, and no proof whatsoever of any restrictive electoral system, or any peculiar districting scheme, which gives the group represented by plaintiffs "less opportunity" than other residents of San Fernando to participate successfully in the entire and complete electoral process in electing their municipal officers. In this case before us, the findings and conclusions made by the trier of fact are directly contrary to the findings and conclusions quoted by the Supreme Court in *White v. Regester, supra*. Just as in the latter case, "we have no reason to disturb them" (*Id.* at 767, 93 S.Ct. at 2340), and,

"On the record before us, we are not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of the Bexar County multimember district in the light of past and present reality, political and otherwise." (*Id.* at 769–770, 93 S.Ct. at 2341)

We adopt the opinion of the district court judge, 455 F.Supp. 625, and *Affirm* his action granting summary judgment to the defendants.

Appendix to follow.

---

4. ". . ., [T]he District Court first referred to the history of official racial discrimination in Texas, which at times touched the right of Negroes to register and vote and to participate in the democratic processes. 343 F.Supp. at 725. It referred also to the Texas rule requiring a majority vote as a prerequisite to nomination in a primary election and to the so-called 'place' rule limiting candidacy for legislative office from a multimember district to a specified 'place' on the ticket, with the result being the election of representatives from the Dallas multimember district reduced to a head-to-head contest for each position. These characteristics of the Texas electoral system, neither in themselves improper nor invidious, enhanced the opportunity for racial discrimination, the District Court thought. More fundamentally, it found that since Reconstruction days, there have been only two Negroes in the Dallas County delegation to the Texas House of Representatives and that these two were the only two Negroes ever slated by the Dallas Committee

for Responsible Government (DCRG), a white-dominated organization that is in effective control of Democratic Party candidate slating in Dallas County. That organization, the District Court found, did not need the support of the Negro community to win elections in the county, and it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the Negro community. The court found that as recently as 1970 the DCRG was relying upon 'racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community.' *Id.*, at 727. Based on the evidence before it, the District Court concluded that 'the black community has been effectively excluded from participation in the Democratic primary selection process,' *id.*, at 726, and was therefore generally not permitted to enter into the political process in a reliable and meaningful manner." (*White v. Regester, supra*, at 766–767, 93 S.Ct. at 2339–2340).

APPENDIX "A"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ARANDA, RALPH ARRIOLA, HECTOR BARRAGAN, RUTH ESTRADA, JESSMAR GARITO, SYLVESTER MORENO, BARBARA PARRA, and LOUIS VARGAS, <br><br> Plaintiffs, <br><br> vs. <br><br> J. B. VAN SICKLE, PHILLIP JOHNSON, PAUL MACY, QUENTIN JOHNSON, PERRY HARRIS, and HELEN RAMSEY, <br><br> Defendants. | CASE NO. CV 74551 JWC <br> FINDINGS OF FACT AND <br> CONCLUSIONS OF LAW. |

The Motion of Defendants for Summary Judgment came on for argument on May 17, 1976 in courtroom 10 of the above entitled Court, the Honorable Jessie [sic] W. Curtis, Judge presiding.

John A. Lewis and Bill Thompson, attorneys of Lewis, Varni & Ghirardelli, counsel, appeared as attorneys for Defendants and Joaquin G. Avila of the Mexican American Legal Defense and Educational Fund, counsel, appeared for Plaintiffs. Plaintiffs' filed a Memorandum of Points and Authorities in opposition to Defendants' Motion for Summary Judgment. The matter was argued by counsel and submitted. Whereupon the Court on July 16, 1976 rendered its Memorandum of Opinion, finding and concluding as follows:

## FINDINGS OF FACT

1. The City of San Fernando is not, nor has it been at any time in the recent past, racially polarized.

2. Mexican Americans can live anywhere in the city they choose to live.

3. The concentration of Mexican Americans in the "barrio", cannot in any way be traced to city government but is the result of individual desire of the Mexican Americans to associate with those with similar racial and economic status.

4. The undesirable conditions in the barrio, such as old housing, unemployment, poverty, low levels of education, assuming they do exist, are social problems which, to a greater or lesser extent, face all communities and are problems which arise because local governments have not always been able to successfully accommodate the economically and educationally disadvantaged who constitute a portion of their citizenry and in San Fernando there is nothing in the record to indicate that race plays any role in the matter; the underprivileged, be they white, brown or black suffer the same unhappy fate.

5. Although Mexican Americans constitute 48.7 percent of the city's population the highest percentage of registered voters they were able to obtain was 28.7 percent in 1972.

6. The failure of Mexican American voters to elect Mexican American candidates to the council in proportion to their population in the city is attributable, largely, to apathy of the Mexican American voters and not to racially polarized voting.

7. The electoral process is open to Mexican Americans to the same extent it is open to others.

8. There have been no racist campaign tactics against Mexican Americans either in the newspapers or by incumbents or anywhere else.

9. The charges of voter registration irregularities by the city clerk in the election of 1972 was not directed to the Mexican American Community and were made in the performance of her duties as city clerk.

10. The reference to the Mexican American candidates as activists in the elections of 1972 was probably in reference to La Raza Unida Party and its efforts to register Mexican Americans in the barrio and an attack upon this politically activist organization is no more evidence of racial polarity than an attack upon the John Birch Society.

11. There is no evidence of police harassment at the poles; if such incidents did occur, they were no more than a few isolated incidents which fall far short of establishing a pattern from which an inference of voter polarization may be drawn.

12. The concentration of Mexican Americans in nonprofessional categories with the accompanying lower salaries in the city government is attributable to low levels of education and low civic awareness not to any racial discrimination.

13. The small number of councilmen and commission members from the barrio is due to low civic awareness which is the result of high unemployment and low levels of education and not the result of racial discrimination.

14. In response to the needs of the Mexican American community, the city through the Redevelopment Agency was attempting to remove some of the blight in the barrio of which Plaintiffs complain.

15. The city government is not less responsive to Mexican American citizens than to other segments of the community.

16. The reason for maintaining the at large election scheme set forth by the City Administrator, Robert James, in a letter to Assemblyman James Kaiser, to the effect that it would make it difficult for small cities to recruit candidates in every district which is necessary for a meaningful choice by the voters, is reasonable and not arbitrary or capricious as San Fernando is a relatively small, compact city covering an area of approximately 17,000 persons.

17. The at large election scheme in the City of San Fernando is such as to allow all persons irrespective of race to participate in the governing process on an equal basis according to their wishes and their ability.

18. The failure of Mexican American registered voters to participate in the city government and to elect members to the council in proportion to their population has been due to apathy, lack of education, training and experience, lack of economic support and other similar reasons which are applicable to all persons irrespective of their race but who are otherwise similarly situated.

## CONCLUSIONS OF LAW

(1) Plaintiffs' have failed to prove any facts to support their contention that the city's at large election scheme has brought about any dilution of the voting power of it's [sic] Mexican American citizens or that it operates to invidiously discriminate against Mexican Americans.

(2) If all the facts alleged by plaintiffs are true, they do not support plaintiffs' conclusions that the at large election scheme as utilized in the City of San Fernando invidiously discriminates against Mexican Americans.

The Court concludes therefore, that there is no substantial issue of fact which remains to be litigated and the Defendants are entitled to a Judgment as a matter of law. Defendants' Motion for Summary Judgment is therefore granted and the clerk is ordered to enter Judgment therefore.

(s) JESSE W. CURTIS
JUDGE OF THE
UNITED STATES
DISTRICT COURT FOR
THE CENTRAL
DISTRICT.

KENNEDY, Circuit Judge, concurring:

After some hesitation, I too conclude that summary judgment was proper in this case, and I concur in the judgment of the court and in the approach adopted by Judge Barnes. Certain conclusions of the trial court do remain troublesome, however, and further comment on these matters seems appropriate.

The standards for determining the constitutionality of systems for electing state legislators set forth in cases such as *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), have not yet been applied by the Court to systems for electing city council members or mayors. This was noted in the concurring opinion of four Justices in *Wise v. Lipscomb*, 437 U.S. 535, 550, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), but it was not there suggested how municipal elections differ in relevant respects from cases involving state legislatures. Perhaps in the two cases different weights might be assigned to the analytic elements examined to determine whether or not the election system is unconstitutional, cf. *United States v. Uvalde Consolidated Independent School District*, 461 F.Supp. 117, 122 (W.D.Tex. 1978); 87 Harv.L.Rev. 1851, 1857 (1974), but where a system for electing government representatives is created or maintained for the purpose of discriminating against a minority group, see *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), it must be held unconstitutional whether municipal or state elections are involved. As the Fifth Circuit has done, see *Marshall v. Edwards*, 582 F.2d 927, 930 n. 4 (5th Cir. 1978), *and cases cited therein,* it is appropriate to apply the principles of *White, Whitcomb,* and other relevant precedents to suits challenging municipal at-large election methods.

The plaintiffs originally brought this suit alleging violation of both the fourteenth and fifteenth amendments, but on appeal they do not argue in the briefs that fifteenth amendment standards differ from fourteenth amendment standards. *See Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), *petition for cert. filed*, 47 U.S.L.W. 3247 (Sept. 22, 1978) (No. 78–492). Moreover, I assume *arguendo* that under either or both the fourteenth or fifteenth amendments the court could grant equitable relief to restructure an at-large system where necessary to correct deliberate government acts designed to deprive ethnic minorities of political participation or political benefits, even without a finding that the system itself was maintained with that intent. Nevertheless, that remedy would not be justified in this case, since restructuring the election system is so fully disproportionate to any discriminatory act that might be established after hearing all of the plaintiffs' evidence here.

The precise wrong the plaintiffs appear to assert in the case is that the city council refused to submit to the electors an ordinance providing for the election of members of the legislative body by or from districts, as is permitted under Cal.Gov.Code § 34871. Based on the evidence adduced by these plaintiffs, I do not think a reasonable finder of fact could conclude, see *Tyler v. Vickery*, 517 F.2d 1089, 1094 (5th Cir. 1975), that the at-large electoral system of San Fernando was operated or maintained for the purpose or with the intent of discriminating against ethnic minorities.

The forbidden intent, normally considered a finding of fact, *but see United States v. City of Chicago*, 549 F.2d 415, 425 (7th Cir. 1977), may be inferred either by direct evidence bearing on passage or maintenance of the at-large system, or, as is more usually the case, from evidence bearing on other aspects of the political system. Thus, under *White* and *Whitcomb*, improper intent may be inferred from evidence demonstrating that "the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. at 766, 93 S.Ct. at 2339.

In *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), *aff'd on other ground sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), the Fifth Circuit developed a framework for district courts considering whether a minority group has been denied equal access to the political process as part of a claim that an at-large plan was maintained with a discriminatory *purpose*.

The court in *Zimmer* established two categories, one containing criteria going primarily to the issue of denial of access or dilution, the other containing inquiries as to the existence of certain structural voting devices that may enhance the underlying dilution. The "primary" factors include: the group's accessibility to political processes (such as the slating of candidates), the responsiveness of representatives to the "particularized interest" of the group, the weight of the state policy behind at-large districting, and the effect of past discrimination upon the group's participation in the election system. 485 F.2d at 1305. The "enhancing" factors include: the size of the district; the portion of the vote necessary for election (majority or plurality); where the positions are not contested for individually, the number of candidates for which an elector must vote; and whether candidates must reside in subdistricts.

*Nevett v. Sides, supra*, 571 F.2d at 217 (footnote omitted). While I would not necessarily adopt the *Zimmer* test as the law of this circuit, it is a useful way to approach whether a minority group has been denied access to the political process.

The Supreme Court's analysis of challenges to various methods for electing representatives has produced another principle important for resolution of this case. The Court has stated unequivocally that minority groups have no constitutional right to proportional representation in a legislative body. Failure to elect a minority candidate, whether the government entity maintains an at-large election scheme or some other method, does not by itself violate the Constitution. *See United Jewish Organizations v. Carey*, 430 U.S. 144, 166–67, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *id.* at 179–80, 97 S.Ct. 996 (Stewart & Powell, JJ., concurring in the judgment); *Whitcomb v. Chavis*, 403 U.S. at 148–60, 91 S.Ct. 1858. A showing that minority group candidates consistently lose at the polls may be a prerequisite to a claim, supported by other evidence, that the voting scheme is maintained with discriminatory intent. *See Nevett, supra* at 223. If, however, the only evidence offered by a plaintiff challenging an at-large voting system is the outcome of elections, summary judgment is appropriate. No reasonable person could infer from only these election results that the at-large method was maintained because of discriminatory intent.

The facts on which plaintiffs base their claim are detailed at greater length in the majority and district court opinions. They include: Mexican-Americans in 1970 constituted 48.9% of the city's population; the highest percentage of Mexican-American registered voters was 28.7% of all registered voters in 1972; since 1911 three Mexican-Americans have been elected and one appointed to the city council; some Mexican-American poll watchers were harassed during the 1972 elections; half to nearly all the polling places in recent elections have been located in homes of families, none of which are Spanish surnamed;[1] a lower percentage of Mexican-Americans are appointed as participants in the mechanics of operating the elections than exists in the general population; a lower percentage of Mexican-Americans have been appointed to city commissions, at least since 1964, than exists in the general population; two construction proposals were considered, one for expansion of a street, and one for the building of

---

1. The plaintiffs' brief summarizes the facts:

For the 1972 election, only 5 out of the 15 polling places were located in public buildings; the remaining polling places were non-Spanish-surname households. For the 1964 election, only 5 of the 27 polling places were Spanish-surname households. Out of the 27 polling places for the 1964 election, only 3 were public buildings. In the 1970 elections, out of the 13 polling places, only seven were public buildings, and there were no Spanish-surname households.

an apartment complex, and relevant portions were deleted as a result of sentiment expressed by members of the barrio community; the city failed to place a stoplight at a street intersection in the barrio; prior to 1948 racially restricted covenants existed in real estate deeds; a particular newspaper editorial was printed in 1954; passages from a few newspaper articles from the early 1900's allegedly contained disparaging words about Mexican-Americans; at the time of a Mexican-American voter registration drive the city clerk in 1972 issued statements concerning alleged voter registration irregularities; and the mayor issued a subsequent statement concerning the efforts of "activists" to take over the city government. Finally, it is undisputed by the parties that the municipality of San Fernando has a population of about 16,500, that its area is approximately two square miles, and that Mexican-American candidates have appeared on the ballot and campaigned for council positions in recent elections.

Assuming that plaintiffs' factual allegations are true, when taken together, they would not permit a reasonable person to infer that the at-large system for electing the mayor and city council members is maintained because of an invidious intent. Viewed through the *Zimmer* framework, it is apparent that only a very small number of the facts alleged are probative of discriminatory maintenance of the at-large plan or denial of opportunity to participate in the political processes.

Political parties do not take an active part in city council elections. It is thus not necessary for a potential candidate to secure approval through party primaries or slating processes in order to appear on the ballot. *Compare White v. Regester,* 412 U.S. at 766–67, 93 S.Ct. 2332. Further, Mexican-American candidates have appeared on the ballot and campaigned for council positions in recent elections, and a Mexican-American candidate was almost elected to the council in 1974 and was later appointed to the city council. In addition, there is no claim that the city council set barriers to voting registration. Finally, I note that several of plaintiffs' allegations of

defects in the electoral process resulting from the use of English only in registration and voting procedures appear to be remedied by the Voting Rights Act of 1975, 42 U.S.C. § 1973aa–1a(a), and Cal.Elections Code § 1635 (1975), and there is no allegation that defendants have not complied with these statutes. This fact is highly probative regarding equal access to the political process. *Cf. Hendrix v. Joseph,* 559 F.2d 1265, 1268 (5th Cir. 1977).

Also relevant to determining access to the political process is plaintiffs' evidence regarding the location of many polling places in private white homes outside the barrio. *See* note 2, *supra.* The district court made no explicit finding as to the reasons why so few polling places were located in the barrio or in a Mexican-American surnamed home. I believe plaintiffs' evidence in this respect might be sufficient in other contexts to survive a summary judgment motion, but assuming plaintiffs' charge of discriminatory placement is true, the facts still cannot reasonably be viewed as indicating denial of access to the political processes which in turn would justify either an inference that the at-large system was maintained because of discriminatory intent or a finding that restructuring the system is the appropriate remedy to cure the violation. There is no substantial evidence in the record indicating that location of polling places has made it systematically more difficult for Mexican-Americans to vote, causing Mexican-Americans who otherwise would have voted to forego voting. More important, placement of polling places is only one component of determining accessibility to the political processes.

The facts advanced by plaintiffs similarly cannot reasonably be viewed as suggesting that San Fernando's municipal government is unresponsive to the particular interests of the Mexican-American community. Plaintiffs refer to a proposed redevelopment project which was opposed by several barrio residents. The project was substantially altered in response to comments by members of the Mexican-American community, which suggests just the opposite conclusion from what plaintiffs seek to prove.

Plaintiffs' other evidence regarding unresponsiveness is more substantial. Mexican-American representation on various city commissions is, in general, substantially lower than the percentage of Mexican-American residents or registered voters. The district court found: "The small number of councilmen and commission members from the barrio is due to low civic awareness which is the result of high unemployment and low levels of education and not the result of racial discrimination." It is not clear that service on the various city commissions requires a high level of education or that the small number of Mexican-American councilmen results from the lack of available qualified Mexican-Americans. The district court's finding may, after further examination, turn out to be not clearly erroneous, but it was not proper on summary judgment to conclude this result was not the product of deliberate bias. Even assuming invidious discrimination in city commission appointments, however, it does not follow that the present election system must be restructured.

Plaintiffs also present city employment data showing that Mexican-Americans are employed primarily in the nonprofessional and lower salary categories. The district court did not improperly choose between competing reasonable inferences in concluding that professional positions require higher levels of education than nonprofessional positions. Given the undisputed facts that as of 1970 10% of barrio residents had no education, 20.8% had a high school education, and 2.0% had a college education, the employment statistics are insufficient in this context to support a reasonable inference that the city's hiring policies reflect unresponsiveness to the Mexican-American community.

*Hendrix v. Joseph* is relevant both to commission appointments and employment data. In that case the Fifth Circuit reviewed a district court holding that the at-large system for electing the county commission of Montgomery County, Alabama, was unconstitutional. The facts were roughly similar to those in the instant case; indeed, plaintiffs' case was stronger

in many respects in *Hendrix* than here. In its discussion of the commission's responsiveness to minority interests, the court noted that the commission had *already* been found guilty of discriminatory hiring practices and was under court order to end those practices. *See id.* at 1269. Noting that "the hiring disparity here is indicative of some measure of lack of responsiveness since the prerequisites to a hiring discrimination lawsuit include a showing of intentional refusal to hire otherwise qualified persons by the defendant Commission," the court still concluded: "This finding alone, however, is not enough . . . Hiring disparity is relevant at all only because it is suggestive of the fact that the Commission believes it can treat black citizens unequally with impunity. Such a belief, of course, is in turn a symptom of dilution . . . The allocation of jobs is only one piece of the puzzle." *Id.* The court eventually held that, as a matter of law, the facts found by the district court were insufficient to support a finding of unconstitutionality, and remanded for further proceedings. As discussed below, plaintiffs' evidence may be sufficient in other contexts to justify some relief. I agree with the court in *Hendrix* that this type of evidence cannot as a matter of law support a finding that the at-large plan is unconstitutional.

The remaining factors of the *Zimmer* test favor the defendants. The state's policy supporting at-large plans is long standing. Indeed, it was only in 1955 that California passed a statute permitting cities the option of holding single-member district elections. *See* Cal.Gov.Code § 34871. Further, the continued vitality of the state and local interests supporting at-large plans is illustrated by recent hearings conducted by the state legislature over various proposals to restructure local election plans. *See, e. g.,* Hearings Before the Assembly Committee on Elections and Reapportionment, Whether City Councilmen Should Be Elected by District; Whether Local Elections Should Become Partisan, October 10, 1975 (conducted at San Fernando City Hall). As to the effect of past discrimination on plain-

tiffs' ability to participate in the election system, the relevant facts are the existence of racially restrictive covenants in property deeds, not outlawed until *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), newspaper articles from the early 1900's and one from the mid-1950's which, construed favorably to plaintiffs, show general anti-Mexican-American sentiment in the community, and apparently a lower rate of voter registration among Mexican-Americans than whites. Plaintiffs did not present to this court the percentage of voter registration among eligible Mexican-Americans, but I infer from plaintiffs' other statistics it is lower than that of whites. San Fernando does not have the history of pervasive official discrimination which is discussed in several Fifth Circuit voting dilution cases. And, while it appears that the residential patterns of the city are at least in part the product of past discriminatory covenants, the relation of this fact either to voter registration data or other indicia of inability to participate in the political process is remote at best. As the court in *Hendrix* stated: "The factual question is whether that discrimination precludes effective participation in the electoral system by blacks today in such a way that it can be remedied by a change in electoral systems." 559 F.2d at 1270. On the facts presented, the answer to that question must be no.

Of the "enhancing factors" listed in *Zimmer,* three out of four favor the defendants. San Fernando is smaller than most populations where at-large plans have been found unconstitutional. *But see Kendrick v. Walder,* 527 F.2d 44 (7th Cir. 1975) (population of 6227). A majority of the votes is not necessary to be elected; the candidates with the most votes are elected to the available positions. A voter in San Fernando need not cast all of his or her allotted votes. The factor which favors plaintiffs is that there is no requirement that candidates reside in any particular geographical district.

"In cases such as these, all factors must be considered, and those which imply a non-diluted system cannot be ignored." *Hendrix, supra* at 1270. The standards described in relevant Supreme Court cases do require balancing several elements, and such balancing is normally the province of the finder of fact. Still, there comes a point where the paucity of factors supporting a plaintiff, and the abundance of those supporting the defendant, require that summary judgment be granted. That point has been reached here. Although the case favoring summary judgment is not overwhelming, the facts plaintiffs allege could not reasonably support strong enough inferences on enough aspects of intentional denial of access to the political process to justify striking down the at-large plan. *See Hendrix v. Joseph, supra. Cf. Black Voters v. McDonough,* 565 F.2d 1 (1st Cir. 1977); *McGill v. Gadsen County Commission,* 535 F.2d 277 (5th Cir. 1976).

To conclude that the plaintiffs' evidence could not justify striking down the at-large election system does not, in my view, necessarily mean that plaintiffs may not be entitled to some relief. For example, plaintiffs' statistics regarding placement of polling places in private homes, few of which are Spanish-surnamed or located in the barrio, might be sufficient to withstand a summary judgment motion in a lawsuit seeking to have some of the city's polling places located in the Mexican-American community. Similarly, although a minority group does not have a constitutional right to proportional appointments on municipal commissions, the plaintiffs' showing in this case regarding Mexican-American representation of city commissions might, after further examination, justify a remedial requirement of increased consideration and/or appointment of Mexican-Americans to such bodies. These factors are mentioned solely to define the limits of our decision and not to suggest the outcome if such a case were presented.

What distinguishes the present case from the possible challenges mentioned above is the weakness of the inference of intent and the more extreme nature of the remedy sought here. Federal courts have required single-member districting plans to be prepared and implemented where plaintiffs

have demonstrated the appropriateness of such a remedy. Conceivably, reasonable people presented with plaintiffs' evidence in this case might make a finding of intentional discrimination in some aspects of the city's political processes. That evidence is not, however, sufficient to permit invalidation of the at-large electoral mechanism.

For the foregoing reasons, I concur in the judgment of the court.